No. 48,897

STATE OF KANSAS, *Appellee,* v. LARRY KEITH BISHOP, *Appellant.*
(574 P.2d 1386)

Opinion filed February 25, 1978.

*Walter F. Stueckemann,* of Jetmore, and *David L. Patton,* of Smith & Patton, of Dodge City, argued the cause and were on the brief for the appellant.

*John E. Fierro,* special prosecutor, of Dodge City, argued the cause; and *Curt T. Schneider,* attorney general, and *B. A. Lightfoot,* county attorney, were with him on the brief for the appellee.

The opinion of the court was delivered by

McFARLAND, J.: This is a direct appeal in a criminal action in which defendant-appellant was convicted after a trial by jury of first degree murder (K.S.A. 21-3401) and aggravated burglary (K.S.A. 21-3716).

The defendant and his wife, Joy, resided in Jetmore, Kansas, in a house owned by Joy's mother. Five children lived in the home, only one of whom was a child of the marriage. Three of the children were defendant's from a prior marriage. The fifth was Joy's three-year-old child, David. Marital problems arose and the defendant moved out of the home. A married couple moved in with Joy and the children. Joy filed for divorce and a restraining order was issued barring defendant from the premises. The defendant moved into New Chance, Inc., a halfway house in Dodge City, Kansas, for assistance with his drinking problems.

On the evening of July 24, 1976, Joy and the children visited the defendant at the halfway house. An argument erupted and the visitors left. Later on in the evening the defendant called Joy in Jetmore and a heated argument occurred. Still later the same evening another call was placed by defendant to Joy but she was not at home. The defendant suspected Joy of engaging in in-

fidelities and had made several threatening remarks about her to individuals at the halfway house. The Bishop marriage had been stormy for many months with the law officers being called in at various times to investigate family disturbances. At about 1:30 A.M. on July 25, 1976, the defendant's vehicle was seen a short distance from Joy's home. Witnesses saw the defendant's vehicle on the highway headed from Jetmore to Dodge City between 2:30 and 3:00 A.M. At 3:45 A.M. on the same morning Joy was found dead in her bed. Her son David was in the bed with two cuts on his leg. Joy had fifteen separate stab wounds. The time of death was fixed at approximately 2:00 A.M.

At 6:15 A.M. the defendant was taken into custody in Dodge City. The defendant was given the *Miranda* warning and questioned by officers. Initially the defendant denied being in Jetmore that night. The following day defendant then gave a statement admitting he had been at Joy's house, that he "must have stabbed her" and detailing his activities including how he returned the butcher knife to its customary place at the halfway house upon his return. The defendant was then transported to Jetmore and an attorney was appointed to represent him.

The defendant's first claim of error is the admission of testimony regarding his initial willingness to take a polygraph test and then his unwillingness to do so. The complained of testimony came from K.B.I. agent Lanny Grosland and is as follows:

Q. "Now, was the taking of a lie detector test discussed with the defendant at this time?
A. "Yes, it was."

. . . . . . . . . . . .

Q. "Did the defendant agree to take a lie detector test?
A. "Yes, sir.
Q. "And was that the reason Tom Lyons was there?
A. "Yes, he is the polygraph operator for the western region of the state.
Q. "All right, did you leave the room—after the defendant agreed to take the test, did you leave the room?
A. "Yes, Special Agent Lyons prepared the polygraph to give it to the defendant and I left the room.
Q. "All right, he was preparing it and you left?
A. "Yes.
Q. "All right, what happened—what do you recall happened next?
A. "A short period of time later—maybe five, ten minutes, I'm not sure; Lyons called me on the telephone or the intercom there at the jail and asked me to come back in the room.
Q. "What did he tell you?
A. "I came back in and he told me that Larry had told him about what had occurred the night before.

Q. "All right, did he tell you that any test had been conducted?

A. "He said he started to give the examination to Larry and Larry said, 'Well, it's not necessary, I would like to talk about it.'

Q. "He said, 'I would like to talk about it' and no test was conducted?

A. "No, sir."

Immediately thereafter the defendant made his damaging statements to the officer. It should be born in mind that the defendant had consistently denied involvement with the crime and then he agreed to take a polygraph test. The above quoted conversations took place. Thereafter, the defendant "confessed." To put it another way the defendant was denying the crimes and agreeing to take a lie detector test. Then he said that the test would not be necessary as he would like to talk about it. This is followed by the confession.

The defendant contends that this is evidence of unwillingness to take a polygraph contrary to our holding in *State v. Stafford,* 213 Kan. 152, 515 P.2d 769. We do not agree. The defendant did not refuse to take the test, he only said it was not necessary as he wanted to talk. The implication is that the test was not necessary as the defendant would tell the truth in what he intended to say. The prohibition against evidence of a defendant's unwillingness to take a polygraph test is that it implies the defendant was lying and that he refused for fear of failing the test. The objected to testimony states the conversation occurred immediately preceding the defendant's damaging statements. The jury had the duty to weigh the evidence and that included the confession of the defendant. The circumstances leading up to the confession were relevant and material. There was no error in the admission of testimony relative to the proposed polygraph test in this particular case.

The defendant's second claim of error is the admission of opinion evidence as to the guilt of the defendant. K.B.I. agent Grosland testified he had interviewed thirty-two persons in the course of his investigation of this case. Among these persons was defendant's eleven-year-old daughter Kimberly who said she had seen another person in the house. The objected to testimony is as follows:

Q. "In the course of your investigation, Agent Grosland, since July, the morning of July 25, 1976, until the time you are sitting here right now, has your investigation led to the possibility of anyone else committing this offense?

A. "No, sir."

The court sustained an objection to the question as going to the ultimate conclusion. The state then rephrased the question to agent Grosland.

Q. "As I said, based upon your investigation that you conducted since the beginning of this incident on July 25 to the time you are seated here now, has your investigation indicated to you that there was anyone else with a motive or anyone else that could have committed this crime?

MR. PATTON: "We'll object to that also, you honor; leading to the ultimate conclusion.

THE COURT: "Not in the way it's phrased, overruled.

BY MR. FIERRO: (Continuing)

Q. "You may answer.

A. "No."

Under all the circumstances shown in the record, we conclude that this line of questioning, although improper as it went to the ultimate question, constituted harmless error beyond a reasonable doubt.

The defendant's third claim of error is the admission into evidence of his extrajudicial statements. The court held an extensive *Jackson v. Denno* hearing on defendant's motion to suppress. The trial court concluded:

"Well, we certainly don't have the circumstances here that brought around the *Miranda* case or the *Escobedo* case. The statements as given in this case were not given under compulsion, coercion, threats or any incapacity on the part of this defendant. He admits he can read and write—three and a half years in the army with an honorable discharge—I doubt that a person can be as ignorant as is claimed and last three and a half years in the army and have an honorable discharge; and this defendant was warned and given his constitutional rights. He was given every opportunity, under his constitutional rights, even to the part of one of the officers informing him that the charges are serious and he really should avail himself to the services of an attorney, and the defendant said that Mr. Lightfoot had been representing him and that he didn't want to call him. Therefore, he was fully informed of his rights under the constitution, and he knew what his rights were, under the constitution; and he freely and knowingly waived these rights; therefore this Court would conclude the statements as given by the defendant was given freely and voluntarily and they were given by an intelligent person and they would be admissible. . . ."

When a trial court conducts a full pretrial hearing on the admissibility of an extrajudicial statement by an accused, determines the statement was freely, voluntarily and intelligently given and admits the statement into evidence at the trial, this court on appeal should accept that determination if it is supported by

substantial competent evidence. (*State v. Jones*, 222 Kan. 56, Syl. 6, 563 P.2d 1021.) The trial court's decision is supported by substantial competent evidence and will not be disturbed on appeal.

The defendant's fourth claim of error relates to the refusal of the trial court to grant his motion for a new trial which was based on newly discovered evidence.

In *State v. Johnson*, 222 Kan. 465, 565 P.2d 993, we set forth the rules applicable to such motions as follows:

"The rules for granting of a new trial for newly discovered evidence have often been stated. The granting of a new trial for newly discovered evidence is in the trial court's discretion. (*State v. Larkin*, 212 Kan. 158, 510 P.2d 123, cert. den. 414 U.S. 848, 38 L.Ed.2d 95, 94 S.Ct. 134.) A new trial should not be granted on the ground of newly discovered evidence unless the evidence is of such materiality that it would be likely to produce a different result upon re-trial. (*State v. Hale*, 206 Kan. 521, 479 P.2d 902.) The credibility of the evidence offered in support of the motion is for the trial court's consideration. (*State v. Anderson*, 211 Kan. 148, 505 P.2d 691; *State v. Larkin*, supra.) The burden of proof is on defendant to show the alleged newly discovered evidence could not with reasonable diligence have been produced at trial. (*State v. Lora*, 213 Kan. 184, 515 P.2d 1086; *State v. Arney*, 218 Kan. 369, 544 P.2d 334.) The appellate review of an order denying a new trial is limited to whether the trial court abused its discretion. (*State v. Campbell*, 207 Kan. 152, 483 P.2d 495; *State v. Anderson*, supra.)" (p. 471.)

The deceased had been with a number of people shortly before she died. Conflicting times of events were stated. This was also true of witnesses testifying to defendant's activities during the night in question. During the trial, the defense tried to establish that a Rodney Gibbs committed the crime. At the hearing on the motion for a new trial a number of the trial witnesses were called and some changed their testimony as to times and other matters. At the conclusion of the hearing, the trial court made the following determination:

"I understand that. Now, I would like to note *State vs. Green* [211 Kan. 887, 508 P.2d 883]; first headnote, newly discovered evidence having the possibility of a different verdict. I quote: 'A new trial should not be granted on the ground of newly discovered evidence unless the district court is satisfied the evidence would probably produce a different verdict.' In this case, assuming that Norma Byrum—assuming that the jury heard the evidence that she gave today, and the evidence that she gave previously, and assuming that they heard the testimony of Rodney Gibbs as they heard him previously, and as they heard it today, and assuming that Wesley Dean Peterson testified as he did today, and also assuming that Mr. Beltz had testified to the effect that during a drunken party Rodney had said something to the effect that he had been responsible, may have been

responsible; and this time factor in these situations—there is very, very little certainty as to the precise moment that various things occurred. The State put in evidence of even some conflicting time factors, and the jury had all of this to consider.

"In my opinion, if all of this evidence had been before the jury in this case, it would not have produced any different verdict than the verdict that was handed down by this jury on January 22, 1977. For that reason, this Court would deny the motion for a new trial based upon the theory of newly discovered evidence. Thank you, gentlemen."

After a careful review of the record, we find that the trial court did not abuse its discretion in denying the defendant's motion for a new trial.

The defendant's fifth and final claim of error is the failure of the trial court to direct a verdict of not guilty on the aggravated burglary charge. The defendant was convicted of aggravated burglary of the home he had resided in prior to the time he moved out because of marital strife. His wife, the deceased, had subsequently filed for a divorce and had obtained a restraining order against the defendant barring him from the premises. The outside doors were locked and the people in the house were asleep. The defendant gained entry by cutting a screen door.

K.S.A. 21-3716 provides:

"Aggravated burglary is knowingly and without authority entering into or remaining within any building, . . . in which there is some human being, with intent to commit a felony or theft therein."

The defendant argues this was his home and a person cannot be convicted of burglarizing his own home. He admits knowledge of the restraining order but evidence was introduced that he had, on occasion, been to the home while the restraining order was in effect. There was no evidence of any consent to enter the home at the time in question. Under the circumstances shown in this case the trial court did not err in failing to direct a verdict of not guilty of aggravated burglary.

We have examined all points raised and the judgment is affirmed.