No. 50,637

No. 50,483

STATE OF KANSAS, *Appellee,* v. WALTER MYRICK, a/k/a TOMMY McCLENDON, a/k/a TOMMY SPEAR, *Appellant,* and STATE OF KANSAS, *Appellee,* v. JIMMIE K. NELMS, a/k/a BLANCHE WALLACE, a/k/a STEVEN COOPER, *Appellant.*

(616 P.2d 1066)

Opinion filed August 28, 1980.

*Wallace F. Davis,* of El Dorado, argued the cause and was on the brief for appellant Jimmie K. Nelms.

*Olin Stansbury,* of El Dorado, argued the cause and was on the brief for appellant Walter Myrick.

*Norman G. Manley,* deputy county attorney, argued the cause and *Robert T. Stephan,* attorney general, and *Geary N. Gorup,* county attorney, were with him on the brief for the appellee.

The opinion of the court was delivered by

HERD, J.: Defendants Jimmie K. Nelms and Walter Myrick were tried together and convicted by a jury of premeditated and felony murder (K.S.A. 21-3401); aggravated kidnapping (K.S.A. 21-3421) and unlawful possession of a firearm (K.S.A. 21-4204[1][b]). Both defendants were sentenced to two life terms for murder and aggravated kidnapping and 6 to 20 years for unlawful possession

of a firearm, to run consecutively. The convictions arose from the circumstances surrounding the death of Kansas Highway Patrolman Conroy G. O'Brien.

At approximately 6:00 a.m. on May 24, 1978, Steven Cahoon, a security guard company manager traveling the Kansas Turnpike, found Conroy G. O'Brien dead in a ditch in northern Butler County at mileage marker 94.5. O'Brien had been struck on the back of the head and shot twice through his left ear. The facts surrounding this tragic incident were later revealed at trial as follows. Shortly after daybreak on the 24th, O'Brien stopped a 1973 white over gold Mercury Marquis for speeding. Walter Myrick, 25, was the driver. Jimmie K. Nelms, 31, was the owner of the car and back seat passenger at the time the car was stopped. Stanford Swain, 21, was the front seat passenger. The three occupants had met in Tulsa, Oklahoma, the previous evening where they agreed to travel together. Nelms was having domestic problems and had decided to go to California. Myrick and Swain agreed to buy half the gasoline in exchange for a ride to Denver. With Nelms driving, the three departed Tulsa and drove west to I-35 highway, then turned north. During the trip, each man smoked a couple of marijuana cigarettes. The three traveled northward, intending in Wichita to proceed on I-135 to Salina and then west to Denver on I-70.

Somewhere between Perry, Oklahoma, and Wellington, Kansas, Nelms turned the driving over to Myrick and retired to the back seat for some needed sleep. Myrick missed the I-135 exit at Wichita and followed the turnpike toward El Dorado and Matfield Green. At about 5:00 a.m. Myrick noticed a highway patrol car approaching from the rear with its signal light flashing. He alerted Swain and Nelms, pulled to the side of the road and stopped. Trooper Conroy O'Brien stopped his car directly behind Nelms' vehicle. He advised Myrick he was speeding and asked him to step back to the patrol car. Myrick complied, entering the trooper's car on the passenger side. O'Brien sat on the driver's side to make out the ticket.

When Myrick left the car, Nelms muttered to Swain, "I am going to kill that mother fucker." He took his gun from the glove compartment and walked back to the passenger's side of the trooper's car. O'Brien told Nelms to come around to the driver's side. Nelms complied, walking in front of the trooper's car. He

walked past the driver's door, stopped as he reached the back door, turned and brandished his handgun, surprising O'Brien. O'Brien was ordered to get out of the car and to place his hands on the top of his head. Nelms and O'Brien then walked behind the trooper's car with Nelms directing O'Brien to proceed to the ditch. As they passed the passenger side of the car, Myrick got out and followed the two of them quite closely. At this point, Swain could see from Nelms' car that O'Brien's gun had been taken from him but Myrick remained unarmed. Nelms directed O'Brien to lie down in the ditch. O'Brien pleaded: "Don't treat me this way." Nelms struck the trooper across the back of his head with the barrel of O'Brien's pistol which Nelms had obtained. When O'Brien fell to the ground, Nelms fatally shot him twice through the head with the same pistol.

Thereafter, Nelms and Myrick hurried back to Nelms' automobile. Nelms explained he had to kill the trooper and got behind the wheel. Swain remained a front seat passenger and Myrick got in the back seat. The three hurriedly left the murder scene. In their haste to find a way off the turnpike, they drove past the Emporia exit. They eventually stopped at the Emporia service area where they bought $12 worth of gasoline. While at the service station, Nelms studied the map which led him to turn around and go back to the Emporia exit where they left the turnpike and proceeded west on U.S. Highway 50.

Nelms' car was not running well. After going a few miles west on U.S. 50, Nelms turned off the highway onto a dirt road for the stated purpose of stealing a car, killing the owner, if necessary, in the process. They drove to a farmhouse and luckily no one was home. They returned to U.S. 50 and turned west to U.S. Highway 77, then north toward Herington. A few miles after turning north, the trio met highway patrolman Charles Smith. Smith was instantly suspicious and made a U-turn and followed defendant's vehicle. The defendants observed Smith's action and turned off the highway onto a dirt road. At this juncture, Myrick threw Trooper O'Brien's gun out of the car window. Ironically, the country road turned out to be a dead end. With Trooper Smith rapidly approaching, Nelms drove his car first through a metal gate, then a wire gate, and out into a pasture, where he spun around and started back to the road. At this point Swain jumped from the car and ran to a nearby creek where he hid until

captured. Nelms' car and the patrol car stopped after a head-on collision at the gate and a gun battle ensued. Smith saw both Nelms and Myrick brandish firearms and saw one shot fired from Nelms' side of the car. He got behind the dashboard and heard a few more shots, some of which penetrated his windshield. Smith returned fire through the windshield. He didn't see or hear any shots from Myrick's side of the car but saw Myrick point the gun at him and heard it click a few times. The trooper then moved out of the car and crouched behind the protection of his open door and continued to do battle, now with his riot gun. Myrick left Nelms' car and ran across the pasture. Nelms remained but had now moved to the trunk of the car where, it was later learned, he went to replenish his supply of ammunition. In the meantime, Smith continued to fire his riot gun and had radioed for help. Nelms was shot in the eye by one of the shotgun pellets. Smith yelled at him and told him to get away from the car, believing he might be surrounded by the two, with Myrick behind him in the field and Nelms in front of him. Nelms complied by joining Myrick, who was hiding by a bridge. Additional troopers arrived and Nelms and Myrick were found and arrested by 10:00 a.m. They were given *Miranda* warnings, placed under arrest and held in separate cars while the law enforcement people, now numbering 200 to 300, looked for Swain who was hiding in the bushes. He was captured at 10:55 a.m.

Salina Police Chief John Woody was assigned the task of interviewing Myrick. Myrick was uncommunicative until he saw Swain had been apprehended, whereupon he asked Chief Woody to have Swain brought to the car and stated, "We will tell you what happened." After Swain was brought to the car, Myrick said, "Let's tell them that's how it really was, that Chico did it," referring to Nelms. Both Swain and Myrick began to talk, often at the same time, with Woody sitting between them in the rear seat of the patrol car. The story which unravelled was essentially the same one later related at trial by Swain. Myrick and Swain agreed on the facts surrounding Conroy O'Brien's death. Swain had been given a *Miranda* warning prior to joining Myrick.

Nelms, who had been wounded in the gun battle, was taken to St. John's Hospital in Salina and then to Wesley Medical Center in Wichita after brief emergency treatment at Herington Hospital. He was accompanied by Police Lt. Gary Hindman and two other

officers. Nelms claimed at trial he had been subjected to police brutality at the hands of these officers in the form of hitting and slapping. The officers denied the accusations.

Myrick and Swain were separately transported to the Herington jail where Myrick was again interviewed by Chief Woody and a K.B.I. agent, Jesse Gragg. During the interview, Myrick admitted the .38 RG40 snub-nosed revolver was his gun and that he had hidden it. At an in camera hearing, Myrick contended the statement was inadmissible, as it was made after he had requested an attorney. The trial court admitted it into evidence.

After reaching the Herington jail, Swain was again interviewed—this time by two K.B.I. agents, Gary Davis and Ray Macy. Later that afternoon, Swain's statement was taken before a court reporter. Swain and Myrick were then transported to the Butler County jail at El Dorado where Nelms joined them a few days later after being released from a Wichita hospital where he had undergone treatment for his wounds. The court then appointed attorneys for each of them. David All represented Swain, Doyle Eugene White, Jr. represented Myrick and Wallace F. Davis represented Nelms.

From the moment Trooper O'Brien's death became known, intense news coverage of the shootout, capture and subsequent trial flooded the state. At the same time, all three suspects were charged with premeditated murder, felony murder, aggravated kidnapping and conspiracy. Later the conspiracy charge was dismissed and the charges of unlawful possession of a firearm were added. The preliminary hearings were held on June 21, 1978. The trial court made the following order entitled "Rules for June 21, 1978."

"In order to insure the orderly and decorous conduct of the court's business and to protect the rights of all parties concerned, the court has ordered that the following rules be placed in effect: 1) All persons desiring access to the Courtroom are subject to inspection by metal detectors. Packages and other closed items will not be permitted in the Courtroom. 2) Members of the public attending Court proceedings should be in their places before Court convenes - late arrivals will not be seated until the next recess. 3) Persons leaving in the middle of proceedings will not be re-admitted until the next recess. Lingering in halls adjacent to the Courtrooms will not be permitted."

An identical order was issued for the trial which began August 21, 1978. That order also banned cameras and recording equipment.

At the preliminary hearings, sheriff's deputies and police of-

ficers guarded the door leading to the courtroom and a deputy armed with a rifle stood guard outside the judicial building.

On June 29, 1978, a motion was filed to consolidate all of the cases for trial. Nelms moved for a change of venue based on his own affidavit, and all three defendants moved for severance on the grounds of antagonistic defenses. The court ordered the cases consolidated and overruled the other motions. Several days before trial, Swain entered a plea of guilty to aiding a felon (K.S.A. 21-3812) and an aggravated weapons charge (K.S.A. 21-4204[1][b]) in exchange for dismissal of the other charges. He received a sentence of 6-20 years, weapons violation; 1-5 years, aiding a felon. The consolidated cases against Nelms and Myrick proceeded to trial on August 21, 1978. Nelms renewed his motions for a change of venue and severance immediately prior to trial. The basis for the renewal motion for a change of venue was the appearance of two newspaper articles published on August 16 and 17, 1978, which reported the disposition of Swain's case stating "the State has validated the testimony of their star witness . . . ." The articles reported that Norman Manley, assistant Butler County attorney stated: "Based on the evidence that we have, Swain pleaded guilty to what we believe he was guilty of." He also stated "that Swain had not seen one of the suspects for two years until last May, and that he knew the other one only slightly . . . 'I don't think he had anything to do with it.' " Nelms maintained the newspaper account was so prejudicial to him he couldn't get a fair trial in Butler County where the newspaper was circulated. The court again denied both the motion for change of venue and for severance.

At the third pretrial conference, defense counsel filed motions in limine seeking an order excluding evidence of the Herington shootout. The motion was denied on the grounds the defendants were charged with unlawful possession of firearms, weapons one could reasonably conclude were in defendants' possession while in Butler County.

The consolidated trial commenced on August 21, 1978, as scheduled with a preliminary motion from Nelms' attorney objecting to the heavily guarded areas in the courtroom and around the courthouse. Myrick's attorney joined in the motion. The court denied the motion with the following statement:

"You are all aware of the situation just as much as I am. I intend to caution

prospective jurors that they should not be influenced by uniforms and that they are to make their decision from what is introduced in evidence in the case and, for the record, the Court feels that it would be remiss if it did anything else. Going back to how the defendants were arrested and what occurred at that time and the conversations with the sheriff, I felt that some sort of security was necessary for all parties that are going to be in the courtroom, not only the defendants, but everybody else and that is why I am checking the prospective jurors is for their safety and no one elses and, of course, the fact that I just want to keep guns out of the courtroom. I think that I have the inherent right to take whatever measures to see that they are kept out, and no matter who goes in there, I have advised the sheriff that I didn't want guns in the courtroom, and I assume that he is following my instructions. If I see something a little different, why I will certainly let him know, but it is for your safety, too, gentlemen. If a gun goes off in there, we are all subject."

The court gave the following limiting admonition to the jury panel:

"Certain efforts of security have been made and you have undoubtedly seen a large number of officers, but I don't want you to be concerned about the number of law enforcement officers around the courtroom at this time . . . The case involves Conroy G. O'Brien who was a member of the Kansas Highway Patrol and many officers, I am sure, made the investigation and the mere fact that there are officers around here and you have gone through—I don't know what they call it—a check for—with a metal detector, that shouldn't concern you. . . . Now, one other thing that I do want to caution you about, this case has received the attention of the news media certainly more than the average case. I feel sure that all of you have either read some if not all of the newspaper items and also heard it reported on the radio and TV. These defendants have a right and should be tried by a jury and, of course, not by a newspaper or radio station or TV station, and they should be tried in this courtroom and not somewhere else. If you are selected as a juror your judgment must determine from what you hear from the witness stand in this courtroom and from what is admitted as evidence and not from what you may have heard about this case some place else and outside of the courtroom."

As voir dire began, Nelms was in the courtroom wearing a suit and a white shirt and Myrick wore a brown jump suit used by prisoners in the Butler County jail. Myrick sat in an obscure corner of the courtroom throughout the trial without shoes for two days. He was later provided bathroom sandals. No objection was made to these matters.

The courtroom was hot and noisy due to the use of fans. The members of the jury panel became tired and short-tempered as a result of the heat. Many were sleepy. In spite of the impediments, the jury was passed for cause at the end of the second day of voir dire. Nelms challenged only four jurors for cause. The challenges were successful on three. Myrick asserted no challenges for

cause. The court excused six jurors for reasons unrelated to publicity and two were released for reasons related to publicity. There were no other disqualifications for cause. The defendants reasserted their objections to the panel, which were overruled.

The conflicts in the defenses of Nelms and Myrick began in the opening statements and continued during the trial. Throughout the trial, Nelms' attorney referred to defendant Myrick by his nickname, "Iron Head." Myrick's attorney retaliated by calling Nelms "Blanche" and "Black Jesus," two of Nelms' many nicknames. Nelms claimed Myrick and Swain conspired to blame him while talking to Chief Woody at Herington shortly after capture. He also contended he had been asleep in the back seat of the car, had awakened at the sound of a shot and found Myrick and Swain standing over the body of the slain trooper. Myrick did not testify, making his defense primarily dependent upon cross-examination and Swain's version of the events of May 24, 1978. The testimony of Police Chief Woody about the conversations of Myrick and Swain immediately after capture and an interview with Myrick at the Herington jail could have developed into a possible confrontation issue but the difficulty was resolved when Nelms waived his right to confrontation with Myrick.

The jury returned a verdict against both defendants on August 30, 1978, and, after the trial court overruled a motion for a new trial filed September 11, 1978 by Myrick, this appeal was filed. One year later, on August 30, 1979, Myrick filed another motion for a new trial based on newly discovered evidence, ineffective counsel, harassment by the deputy sheriff, appointed counsel's conflict of interest, improper clothing and misconduct of the jury. He requested an evidentiary hearing. The trial court denied the motion for a new trial and the request for the evidentiary hearing.

The appellants have raised several issues for review, both in concert and individually. Both defendants allege the trial court erred in instructing the jury as follows: "There is a presumption that a person intends all the natural and probable consequences of his voluntary acts. This presumption is overcome if you are persuaded by the evidence that the contrary is true."

In *Sandstrom v. Montana,* 442 U.S. 510, 61 L.Ed.2d 39, 99 S.Ct. 2450 (1979), the United States Supreme Court held that failure to give the second sentence of this instruction shifted the burden of proof to the defendant and was therefore improper. This issue

was extensively reviewed by the Kansas Court of Appeals in *State v. Acheson*, 3 Kan. App. 2d 705, 712, 601 P.2d 375, *rev. denied* 227 Kan. 927 (1979), and that discussion will not be repeated in this case. The rationale of the Court of Appeals was adopted in *State v. Egbert*, 227 Kan. 266, 267, 606 P.2d 1022 (1980), where we held "[T]he two-sentence instruction given creates 'a permissive presumption and does not shift the burden of proof to the defendant' . . . ." We find no reason to change the rule. This issue is therefore without merit.

Defendants contend the trial court erred in consolidating their trials and in denying their motions to sever. K.S.A. 1979 Supp. 22-3202(3) provides:

> "Two or more defendants may be charged in the same complaint, information or indictment if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting the crime or crimes. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count."

Nelms and Myrick were charged with offenses which arose out of the same action or transaction. The specific rules regarding joinder of defendants were recently stated in *State v. McQueen & Hardyway*, 224 Kan. 420, 423, 582 P.2d 251 (1978):

> " 'Two or more defendants may be joined and tried together (1) when each of the defendants is charged with accountability for each offense included, or (2) when each of the defendants is charged with one or more offenses alleged to be in furtherance of the conspiracy, or (3) when in the absence of a conspiracy it is alleged the several offenses charged were part of a common scheme or were so closely connected in time, place and occasion that proof of one charge would require proof of the others.' "

See also *State v. Watie, Heard and Heard*, 223 Kan. 337, 574 P.2d 1368 (1978); *State v. Roberts*, 223 Kan. 49, 574 P.2d 164 (1977); *State v. Cameron & Bentley*, 216 Kan. 644, 533 P.2d 1255 (1975); *State v. Wheeler*, 215 Kan. 94, 523 P.2d 722 (1974). Unquestionably, the facts and circumstances of this case meet the requirements set out above. The trial court did not abuse its discretion in ordering the defendants to be tried together.

The question of severance presents a more difficult question. Separate trials should be granted under K.S.A. 22-3204 "when severance appears necessary to avoid prejudice and ensure a fair trial to each defendant." *State v. McQueen & Hardyway*, 224 Kan. at 423. We held in *State v. Cameron & Bentley*, 216 Kan. at 649:

" 'The usual grounds for severance are: (1) that the defendants have antagonistic defenses; (2) that important evidence in favor of one of the defendants which would be admissible on a separate trial would not be allowed on a joint trial; (3) that evidence incompetent as to one defendant and introducible against another would work prejudicially to the former with the jury; (4) that a confession by one defendant, if introduced and proved, would be calculated to prejudice the jury against the others; and (5) that one of the defendants who could give evidence for the whole or some of the other defendants would become a competent and compellable witness on the separate trials of such other defendants.' "

The most compelling ground for severance is that of antagonistic defenses. Counsel for both defendants made every effort to show the defendants had antagonistic defenses, even to the extent of acting belligerent toward each other and referring to the defendants by various derogatory street names and alluding to the danger of racial classification by the jury. They also argued a classic case of antagonistic defenses is presented when each defendant blames the other for the offenses charged. The arguments do not fit the instant case. Both defendants were charged with the same offenses, arising out of the same transaction, and both were convicted. Nelms accused Myrick of killing Trooper O'Brien and Myrick relied on the testimony of Swain which was inculpatory to both defendants. Proof of who was the triggerman was immaterial. Myrick and Nelms were together in the commission of the crime and both were properly charged as principals. Their defenses placed both defendants at the scene; both possessed weapons; both fled from the scene in Nelms' car with Nelms driving and both participated in the gun battle at Herington. There was not sufficient proof of antagonistic defenses. The fact the defendants did not like or respect each other and the fact they are both black, being tried to a white jury, did not create a showing of prejudice to warrant severance of their trials. We have repeatedly held that the granting of separate trials pursuant to K.S.A. 22-3204 lies within the sound discretion of the trial court. In *State v. Sully,* 219 Kan. 222, 224, 547 P.2d 344 (1976), this court stated:

" 'Generally, an order for a separate trial of a defendant jointly charged with another must be based upon some ground sufficient to establish actual prejudice so as to require separate trials' (*State v. Cameron & Bentley,* 216 Kan. 644, 649, 533 P.2d 1255). Although a single trial may be desirable from the standpoint of economical and efficient criminal procedure, the right of a defendant to a fair trial must be the overriding consideration."

Did the trial court abuse its discretion in denying the motion

for severance of Nelms' and Myrick's trials? Admittedly, Myrick had a more difficult task of defending himself being tried with Nelms, the triggerman according to Swain. But Swain's testimony was also inculpatory to Myrick, placing him by the side of Nelms at the execution, making no move to prevent the killing. Swain also named Myrick as the person who disposed of O'Brien's ticket book and gun. A separate trial would not have changed that evidence. We find the trial court did not abuse its discretion in denying the motion to sever the trials.

Defendant Nelms alleges the trial court erred in denying his motion for a change of venue. The murder of Trooper O'Brien evoked a feeling of outrage all over the State of Kansas. The press, radio and TV responded in kind. The act was shocking and was resented by people everywhere. Those facts alone, however, do not entitle a defendant to a change of venue. The law with respect to change of venue was recently set forth in *State v. May,* 227 Kan. 393, 394-395, 607 P.2d 72 (1980):

> " 'A change of venue in a criminal case lies within the sound discretion of the trial court. [Citations omitted.] The burden of proof is cast upon defendant to show prejudice in the community which will prevent him from obtaining a fair and impartial trial. [Citations omitted.] Media publicity alone has never established prejudice per se. Defendant must show prejudice has reached the community to the degree it is impossible to get an impartial jury.'
>
> . . . .
>
> " 'Furthermore, prejudice must be established "not as a matter of speculation but as a demonstrable reality." ' "

See *State v. Porter,* 223 Kan. 114, 574 P.2d 187 (1977); *State v. Gander,* 220 Kan. 88, 551 P.2d 797 (1976); *State v. Randol,* 212 Kan. 461, 513 P.2d 248 (1973); *State v. Lamb,* 209 Kan. 453, 497 P.2d 275 (1972); *State v. McLaughlin,* 207 Kan. 594, 485 P.2d 1360 (1971).

The news media releases were factual and contained no derogatory personal references to the defendants, leaving the conclusion which might be drawn from the facts to the listener, viewer òr reader. The reporting was generally objective, and there is no evidence of an attempt to influence the outcome of the trial. See *State v. Sanders,* 223 Kan. 273, 279, 574 P.2d 559 (1977). Because of the type of crime and the statewide publicity, it is doubtful if there are any counties in Kansas where the news of the crime had not reached.

Defendant draws his own conclusions about the jury being

"pre-conditioned" by publicity but fails to present evidence of that alleged bias. It is not the conclusions of a defendant which prove prejudice. Prejudice can be shown only by specific facts and circumstances. *State v. Lamb,* 209 Kan. at 465; *State v. Welch,* 121 Kan. 369, 372, 247 Pac. 1053 (1926). Finally, we note Nelms' experience in voir dire supports the court's denial of a change of venue. A jury panel was passed for cause after two days of voir dire. From a panel of 135, twelve served on the panel, two served as alternates, 51 were peremptorily challenged and eleven were excused for cause. Nelms exercised only four challenges for cause and was successful in three of his challenges. Six were excused for reasons unrelated to publicity. There was no difficulty selecting a fair and impartial jury, an important consideration in weighing a claim of prejudice. See *State v. Gilder,* 223 Kan. 220, 574 P.2d 196 (1977); *State v. Poulos,* 196 Kan. 253, 411 P.2d 694, *cert. denied* 385 U.S. 827 (1966); *United States v. Daddano,* 432 F.2d 1119 (7th Cir. 1970), *cert. denied* 402 U.S. 905 (1971). The appellant has failed to sustain his burden of proof that such prejudice existed against him in Butler County in August 1978 that he was prevented from obtaining a fair trial. The issue is without merit.

Defendants allege the trial court erred in ordering too much security in and around the courtroom and the presence of the armed guards and surveillance equipment resulted in prejudice to both men.

This issue was first raised at a pretrial conference as set out fully in the facts. Defendants made no inquiry concerning the effect of security on the potential jury during voir dire. The basic principle involved is an accused's right to the presumption of innocence until guilt is proved beyond a reasonable doubt; however, the accused's rights must be balanced with the duty of the trial judge to protect the lives of the trial participants and to protect the institution of the judicial process. It is clear the judiciary has the inherent power to use the means necessary to protect and preserve dignity, order and decorum in a criminal trial.

In the case at hand, the trial court had been advised by the defendants that feelings were running high in Butler County against them. In addition, the sheriff had advised the court the defendants might be in danger. Even though the trial judge might

doubt the authenticity of the information, he could not ignore it. He was responsible for the lives of all persons present in the courtroom and had the duty to do what he deemed necessary under the circumstances to properly afford the needed protection, balancing the need for heavy security against the defendants' right to a fair trial. With that in mind, all guns were barred from the courtroom and all who entered were required to submit to inspection with a metal detector. From this distance, it would be easy to find security was overdone, but placing ourselves in the position of the trial judge at that time and place, we find it a proper exercise of the court's power to take the security measures necessary to protect the parties and the judicial process. The balancing of the competing interests lies within the discretion of the trial judge, for it is he who is best equipped to decide which security measures should be adopted. *United States v. Samuel,* 433 F.2d 663 (4th Cir. 1970), *cert. denied* 401 U.S. 946 (1971), see also 431 F.2d 610 (4th Cir. 1970); *Gregory v. United States,* 365 F.2d 203 (8th Cir. 1966); *Guffey v. United States,* 310 F.2d 753 (10th Cir. 1962). No demonstrable prejudice to appellants was shown. The issue is without merit.

Defendant Nelms argues the trial court erred in admitting into evidence an outstanding Missouri warrant issued against him for a felony for which he had not been convicted.

The State introduced the testimony of Chad Simmons who had identified Nelms from a photographic lineup as one accused of robbing a jewelry store in Springfield, Missouri, on April 20, 1978. Simmons also identified the derringer pistol found at the scene of Nelms' capture in Herington as the weapon used in the Missouri robbery. Detective John E. Smith of Springfield, Missouri, testified that pursuant to Simmons' identification of Nelms, a criminal warrant for Nelms' arrest was issued May 16, 1978. Evidence was also admitted showing Myrick was wanted by law enforcement officials in connection with a felony bench warrant and failure to appear on a felony theft charge in Oklahoma under his alias, Tommy Spear. Myrick is not directly challenging the introduction of that evidence in his brief on appeal. The State maintains the evidence is admissible under K.S.A. 60-455 to show motive and intent for the murder. Nelms argues the evidence is inadmissible to show motive or intent without proof he was aware of the outstanding warrant or without a conviction on the charges contained in the warrant.

The rules regarding the admission of evidence of prior crimes or civil wrongs were stated in *State v. Johnson,* 222 Kan. 465, Syl. ¶ 2, 565 P.2d 993 (1977):

"In ruling on the admissibility of evidence of a prior conviction under 60-455, a district court must (1) determine it is relevant to prove one of the facts specified in the statute, (2) determine that fact is a disputed material fact - *i.e.* that it is substantially in issue, and (3) balance the probative value of the prior conviction evidence against its tendency to prejudice the jury."

See *State v. Treadwell,* 223 Kan. 577, 581, 575 P.2d 550 (1978); *State v. Faulkner,* 220 Kan. 153, Syl. ¶ 1, 551 P.2d 1247 (1976).

Conviction is not a prerequisite to introduction of a prior offense under K.S.A. 60-455. *State v. Henson,* 221 Kan. 635, 644, 562 P.2d 51 (1977); *State v. Powell,* 220 Kan. 168, Syl. ¶ 1, 551 P.2d 902 (1976).

As to Nelms' claim that he had to have been aware of the outstanding warrant for his arrest, we find the circumstances of this case do not require such knowledge. It is maintained with considerable credibility that the motive for the senseless slaying of Conroy O'Brien was the defendants' fear they would be identified and returned to Oklahoma or Missouri, as the case may be, for violation of the law. Myrick knew he was violating his parole; Nelms was undoubtedly concerned about his participation in the Missouri robbery approximately a month earlier. Whether Nelms had actual knowledge of the existence of an outstanding warrant is irrelevant. Simmons had positively identified Nelms from a photographic lineup as the man who robbed the jewelry store in Springfield, Missouri. He confirmed that initial identification while testifying in this case. Nelms raised no objections to the testimonies of Simmons and Smith regarding the robbery. This uncontroverted testimony and identification, if believed by a jury, is strong evidence that Nelms committed the robbery. Nelms' knowledge of his participation in the crime far outweighed his necessity of knowing of the existence of a warrant. He could not risk a check by a law enforcement officer.

The trial court properly instructed the jury at the time of admission of the evidence and again in the general instructions that the evidence of the prior offense could be considered solely and exclusively to determine the motive for the killing of O'Brien. We find the trial court properly balanced the probative value of

evidence introduced under K.S.A. 60-455 against its possible prejudice to the accused and there was no error in admitting the evidence. See *State v. Marquez,* 222 Kan. 441, 445, 565 P.2d 245 (1977).

Defendant Myrick contends the trial court erred in overruling his motion for a directed verdict of acquittal. The rules for consideration of a motion for judgment of acquittal were recently set forth in *State v. Tillery,* 227 Kan. 342, 345, 606 P.2d 1031 (1980):

> "A trial judge in passing on a motion for judgment of acquittal must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact therefrom, a reasonable mind, or rational trier of facts, might fairly conclude guilt beyond a reasonable doubt. [Citation omitted.] When the sufficiency of evidence is questioned on appeal a similar standard is used. The appellate court must be convinced that when the evidence is viewed in the light most favorable to the prosecution, a rational factfinder could have found the defendant guilty beyond a reasonable doubt. [Citations omitted.]"

When Myrick went to the patrol car he gave the trooper a false name. He followed Nelms and O'Brien as they proceeded to the ditch' and stood idly by, within a few feet of O'Brien, while Nelms first struck and then shot the trooper. The two walked calmly back to the car where Swain waited. In their flight, Myrick disposed of O'Brien's ticket book and later threw the trooper's service revolver out the car window while they were being chased by Trooper Smith. A significant occurrence in the chain of events was his attempted participation in the gun battle with Trooper Smith. The evidence is uncontroverted that Myrick aimed a gun at Smith from the passenger's side of the car and pulled the trigger a number of times. The gun either misfired or was empty; it merely "clicked." Thereafter, Myrick and Swain ran from the scene and were later captured. The remaining evidence against Myrick is his statement to Chief Woody following his capture when he admitted one of the guns used in the gun battle was his.

Viewing this evidence in the light most favorable to the prosecution, we find a rational factfinder could have found defendant Myrick guilty beyond a reasonable doubt. The trial court properly overruled the motion for judgment of acquittal. The issue is without merit.

Defendant Myrick contends the trial court erred in restricting his cross-examination of Swain. During the cross-examination of

Swain, Myrick's attorney asked Swain to testify to the statements made by Myrick immediately following their capture. An objection was sustained on the grounds the statement was hearsay.

The statement in question is hearsay because Myrick was not available for cross-examination due to the failure to waive his Fifth Amendment privilege by taking the witness stand. *State v. King,* 221 Kan. 69, Syl. ¶ 1, 557 P.2d 1262 (1976).

Myrick baldly asserts the 'statements should be admitted pursuant to K.S.A. 60-403. That assertion appears in his brief without discussion and is apparently abandoned in favor of an argument that the statements should have been admitted pursuant to K.S.A. 60-460(*d*)(2) which provides:

"Contemporaneous statements and statements admissible on ground of necessity generally. A statement . . . which the judge finds was made while the declarant was under the stress of a nervous excitement caused by such perception . . . ."

The statement Myrick was trying to elicit from Swain was allegedly made an hour after his arrest and three hours after the murder, at a time when Myrick was desperately attempting to defend himself and when he had every incentive to falsify his statements. It does not meet the test of contemporaneous statements, which are "statements . . . made so closely connected with the time and place of the crime as to be a part of the *res gestae." State v. Jones,* 204 Kan. 719, 729, 466 P.2d 283 (1970). See also *State v. King,* 221 Kan. at 73. We hold the trial court properly exercised its discretion in restricting Myrick's cross-examination of Swain. This issue is without merit.

Myrick filed a motion for a new trial pursuant to K.S.A. 22-3501 on September 11, 1978, and within 10 days after the verdict. The motion was denied on September 19, 1978. He then filed a timely notice of appeal December 1, 1978. On August 30, 1979, Myrick filed his second motion for a new trial based on newly discovered evidence. He alleges that Stanford Swain's shoes, worn at the time of Trooper O'Brien's murder, have now been found and are available as evidence to show that Nelms was lying when he testified his shoes and those of Swain were replicas of each other. Nelms' defense is that the tracks next to the slain trooper were those of Swain and Myrick and he awoke to the sound of gunfire and surmised one of the men shot O'Brien. Myrick alleges if the shoes had been available to show Nelms was lying, Swain's

testimony exculpating Myrick would have been corroborated. Myrick also asserts various trial errors as a part of his second motion for a new trial: (1) ineffective counsel; (2) his appearance at trial in prison garb; (3) harassment by sheriff's deputies; and (4) prejudice by the jury's failure to hear Nelms' confession from the stand. The only issue properly before this court is the matter of newly discovered evidence; the remaining issues are untimely and cannot be raised by a motion for a new trial due to the ten day limitation. K.S.A. 22-3501. Matters allegedly in violation of either the United States Constitution or the Kansas Constitution may, of course, be raised in a separate proceeding pursuant to K.S.A. 60-1507.

The rules regarding motions brought pursuant to K.S.A. 22-3501 for newly discovered evidence were recently stated in *State v. Bishop,* 223 Kan. 539, 543, 574 P.2d 1386 (1978):

> " 'The rules for granting of a new trial for newly discovered evidence have often been stated. The granting of a new trial for newly discovered evidence is in the trial court's discretion. [Citation omitted.] A new trial should not be granted on the ground of newly discovered evidence unless the evidence is of such materiality that it would be likely to produce a different result upon re-trial. [Citation omitted.] The credibility of the evidence offered in support of the motion is for the trial court's consideration. [Citation omitted.] The burden of proof is on defendant to show the alleged newly discovered evidence could not with reasonable diligence have been produced at trial. [Citation omitted.] The appellate review of an order denying a new trial is limited to whether the trial court abused its discretion.' "

See also *State v. Coe,* 223 Kan. 153, 169, 574 P.2d 929 (1977); *State v. Johnson,* 222 Kan. 465, 471, 565 P.2d 993 (1977); *Jackson v. State,* 1 Kan. App. 2d 744, 746, 573 P.2d 637 (1977), *rev. denied* 225 Kan. 844 (1978).

The evidence is undisputed that the shoes found were those worn by Swain at the time of Trooper O'Brien's murder and that they were not available at trial. They therefore meet the threshold test of newly discovered evidence. The next question is whether Myrick was prejudiced by the unavailability of this evidence. Swain's shoes are actually quite different from those belonging to Nelms. The evidence shows Nelms was lying regarding that point and discredits his testimony. Can we then say that the jury would have brought in a different verdict for Myrick had they known this? We think not. The jury had already rejected Nelms' testimony, evidenced by the fact that they convicted him. We do not

find the presence of the shoes would have so corroborated Swain's testimony that a different result for Myrick would ensue at a retrial. The issue is without merit.

The judgment of the trial court is affirmed.