56,737

STATE OF KANSAS, *Appellee,* v. RICHARD L. FALKE and STEVEN J. WHITE, *Appellants.*

(703 P.2d 1362)

Opinion filed July 26, 1985.

*Roger L. Falk,* of Busch, Johnson & Falk, of Wichita, argued the cause, and *Andrew E. Busch,* of the same firm, was with him on the brief for the appellant Richard L. Falke.

*M. Duane Coyle,* of McMaster & McMaster, of Wichita, argued the cause, and *D. Lee McMaster,* of the same firm, was with him on the brief for the appellant Steven J. White.

*Geary N. Gorup,* assistant district attorney, argued the cause, and *Robert T. Stephan,* attorney general, and *Clark V. Owens,* district attorney, were with him on the briefs for the appellee.

The opinion of the court was delivered by

SCHROEDER, C.J.: This is an appeal in a criminal action from a jury verdict finding Richard L. Falke and Steven J. White (defendants-appellants) guilty of one count each of attempted second-degree murder (K.S.A. 1984 Supp. 21-3301; K.S.A. 21-3402) and aggravated kidnapping (K.S.A. 21-3421). The defendants were jointly tried and convicted.

On appeal both defendants contend the trial court erred in failing to sustain their motions for separate trials. They also contend the trial court erred in failing to sustain their motions for judgment of acquittal. Falke asserts the trial court erred in including certain evidence contained in medical records of his past tendency toward drug and alcohol abuse. Falke also contends the trial court erred in failing to sustain his motion for a mistrial due to prejudicial misconduct of counsel. White asserts, additionally, that his due process rights were violated when the prosecutor, on cross-examination, sought to impeach his testimony with his pretrial, post-*Miranda* statement.

The events leading to the crime for which the defendants were

charged and convicted, began on Thursday, September 8, 1983, when the two defendants left Chanute, Kansas and drove to Wichita, Kansas, in order to "party and everything." They first went to Freddy Ligons' (the victim's) apartment. Falke was acquainted with Ligons, but White had never met him. They arrived at the apartment at approximately 11:30 p.m. While there they drank beer and smoked marijuana with Ligons and his roommate, Marsha Redd. At some point, Ligons excused himself under the pretense of using the restroom, but he did not return. Later, the defendants discovered a stereo and a purse were missing from White's car.

The defendants attempted to locate the missing items while waiting for Ligons to return. When Ligons did not come back, they left and went to the residence of Duane Cook, with whom both defendants were acquainted. They "partied" (drank beer and smoked marijuana) with Cook until 4:00 or 5:00 a.m., at which time they left to return to Falke's residence in Iola, Kansas.

The defendants slept until around noon on Friday. When they awakened, they told Falke's roommate, Roy Culbertson, about the theft and their belief that Freddy Ligons had committed it. Falke borrowed a .22-caliber pistol from Culbertson, explaining that he wanted to use it to get his "stuff" back.

The defendants next went to White's father's house where they asked to borrow a .22-caliber rifle in order to do some target practicing.

They then apparently did do some target practicing. While doing so, they smoked marijuana, drank beer, and made plans to return to Wichita in order to get White's stereo back.

From there, they bought some liquor and then proceeded to White's brother's house. They told him about the theft. White told him that "a 'nigger' had stolen his stereo, he knew where he was at and they were going to find him, either get the stereo or he would pay them or they would shoot him." White borrowed a 12-gauge pump shotgun from his brother.

They left for Wichita at around 8:30 p.m. White testified that he thought they were going to Wichita to "party" with Duane Cook. However, Falke directed White to drive to Freddy Ligons' apartment. White stayed in the car while Falke paid a call to Ligons. Both Marsha Redd and Ligons were at home. Ligons

admitted that he had taken the stereo and that he had sold it to a "fence" named Horace earlier that afternoon. Falke told Ligons that he would be back to pick him up at around 2:00 p.m. the next day, in order to go target practicing.

Falke and White left Ligons' place and went to see Duane Cook. Not finding Cook home, they went to a tavern where they purchased some L.S.D. According to White, both he and Falke took four or five "hits" of the L.S.D. They later returned to Cook's house where they continued to "party." They left there at around 5:30 or 6:00 Saturday morning and drove back to Ligons' apartment.

At this point, the testimony of the State's witnesses and the testimony of the defendants diverge.

White took the stand in his own behalf and testified that upon their arrival at Ligons' apartment, Falke got out of the car and went inside to get Ligons. White testified that he did not see Falke carrying a gun or holding a gun on Ligons at any time. Falke returned with Ligons and they both got in the car. Ligons sat in the back seat and White said there were two guns in the back seat within his reach.

Ligons gave White directions to go to Horace's house, where they went in order to retrieve the stereo. Once there, Ligons and Falke got out of the car and went up on the porch where someone informed them that Horace was not home and wouldn't be back until 9:00 a.m. The three decided to drive around until Horace returned. White testified that they were all in a good mood. Falke directed White to drive out into the country east of Wichita. They stopped in a field. White stated he "hadn't the faintest" idea why they were there, but that "[s]omething was mentioned about target practicing and everything and I had to use the restroom anyway." They all got out of the car. Falke asked White to get the rifle from the car. White did as he was asked and handed the rifle to Falke. White turned away from Falke and Ligons in order to urinate. As he was preparing to do so, he heard the gun go off. White turned to see Falke looking at him and Ligons falling to the ground. At that point White yelled "wait" and got back into the car. As Falke came around the other side of the car, White heard the second shot.

White testified that afterwards Falke cried and said he had shot his best friend. He also testified that Falke told him the first

shot was an accident and that he fired the second time because he panicked. The defendants drove away and left Ligons. White claimed they later attempted to return to "see if he was okay," but they couldn't find their way back.

White also testified that during all of this, he had still been feeling the effects of the L.S.D. He said L.S.D. makes him feel happy and causes him to see colors and hallucinate.

Marsha Redd testified for the State. She said she had returned to Ligons' apartment at around 5:00 a.m. on Saturday. Ligons was in bed asleep. She said she sat up for a while smoking marijuana. At around 6:00 a.m. she heard a car pull up. She looked out her bedroom window and saw it was White's car. She saw Falke get out of the passenger side of the car and put a gun in the waistband of his pants and walk towards the apartment. She tried unsuccessfully to wake Ligons before she hid in the bathroom. She testified that she heard Falke walking up the stairs and then she heard him tell Ligons to get up and something about the gun being for target practice.

Mary Taylor lived down the hall from Ligons. She testified that she heard voices in the hall early Saturday morning which she identified as belonging to Falke and Ligons. She heard Falke say, "Come on, let's go, man." Ligons replied, "I'm not going nowhere." She then heard Falke say something about shooting.

Ligons testified that Falke woke him and held a pistol on him and told him to get dressed. Falke then ordered him to leave the room with him or he would be shot. Falke made Ligons walk ahead of him and kept the gun pointed at his back. Falke ordered Ligons to sit in the back seat of the car, and told him to give White directions to Horace's house. Falke continually kept a gun pointed at him. Ligons testified that he and Falke went into Horace's house. Although they saw the stereo, Horace refused to return it unless he was paid, and he ordered them to get out of his house.

Ligons and Falke returned to the car. At Falke's direction, White drove out of the city to an isolated field. Ligons testified that there was a rifle in the front seat and that White told him he had never used his rifle before, but if Ligons "messed up" he would.

Upon arriving at the field, Falke held a gun to Ligons, ordered him out of the car and told him to lie on the ground on his side.

He heard White tell Falke not to shoot him. Ligons laid flat on his stomach and Falke shot him once in the side. Falke told him to roll onto his side which he did. Ligons felt the gun against his ear, but he remembered nothing after the second shot.

Ligons also testified that both defendants appeared to be high and drunk.

Approximately eleven hours later, Ligons was found lying unconscious in the field. He had been shot once in the abdomen and once in the head. The doctor who treated his head wound remembered there were powder burns near the entry wound which indicated the gun had been fired at close range. The bullet had fragmented and lodged in and near the brain making surgical removal of the fragments impossible. Ligons consequently has difficulty with motor control and cannot form new memories.

The defendants fled to Las Vegas on the day of the crime. However, before they left, they stopped and talked to several people. They first stopped at Falke's mother's home sometime late Saturday morning. Falke asked to borrow money to get out of the state. Falke told her he had "shot and killed a guy in Wichita last night," and White verified his story. She suggested they turn themselves in, but they were unwilling to do so. She testified that neither of the defendants appeared to be too drunk or high to know what was going on.

Shortly before noon, they stopped at Peggy Shrum's home. White told her he'd come to say good-bye because he'd shot a "nigger" in Wichita. He told her he was leaving the state.

The defendants then stopped by Falke's apartment. Falke told Culbertson that he had shot someone and was leaving the state. He said he had shot the person twice. He said it would be quite a while before the body was found.

The defendants sold their pistol and rifle at a gun shop in Las Vegas. A few days later the defendants were apprehended by the Las Vegas police. The guns were retrieved from the gun shop, and it was determined that the rifle was the weapon that had fired the shell casings found at the scene of the crime.

Both defendants contend the trial court erred by denying their motions for separate trials. Under the provisions of K.S.A. 22-3204, when two or more defendants are jointly charged with crime the court may order a separate trial for any one defendant

when requested by such defendant or by the prosecuting attorney. The granting of separate trials lies within the sound discretion which the trial court has the power to exercise. *State v. Myrick & Nelms*, 228 Kan. 406, 416, 616 P.2d 1066 (1980). In exercising its power of discretion, the trial court must remember that, "[a]lthough a single trial may be desirable from the standpoint of economical and efficient criminal procedure, the right of a defendant to a fair trial must be the overriding consideration." *State v. Sully*, 219 Kan. 222, 224, 547 P.2d 344 (1976).

Generally, an order for separate trials of defendants jointly charged must be based upon some ground sufficient to establish actual prejudice. In determining whether there is sufficient prejudice to mandate severance, this court will consider the following factors:

" '(1) [T]hat the defendants have antagonistic defenses; (2) that important evidence in favor of one of the defendants which would be admissible on a separate trial would not be allowed on a joint trial; (3) that evidence incompetent as to one defendant and introducible against another would work prejudicially to the former with the jury; (4) that a confession by one defendant, if introduced and proved, would be calculated to prejudice the jury against the others; and (5) that one of the defendants who could give evidence for the whole or some of the other defendants would become a competent and compellable witness on the separate trials of such other defendants.' " *State v. Martin*, 234 Kan. 548, 549, 673 P.2d 104 (1983).

*State v. Myrick & Nelms*, 228 Kan. at 416; *State v. Cameron & Bentley*, 216 Kan. 644, 649, 533 P.2d 1255 (1975).

Each of the defendants argued different grounds for severance. First of all, defendant White claims that he and defendant Falke had antagonistic defenses. When it can be shown, antagonistic defenses is the most compelling ground for granting severance. In *State v. Sully*, 219 Kan. 222, this court said that the "classic case" of antagonistic defenses was "where each of two defendants was trying to blame the other while trying at the same time to defend against the prosecution." 219 Kan. at 225.

This court granted severance on the ground of antagonistic defenses in *State v. Martin*, 234 Kan. 548. In *Martin*, the State sought to prove that Martin's codefendant was a principal to the crime of murder, while Martin was an aider and abettor. The State presented no evidence linking the two codefendants. Each of the codefendants "defended" by presenting witnesses or testifying that the other codefendant had committed the crime

and that they had not participated. *Martin* was clearly a case where the defendants were prejudiced because only "one of the codefendants must have committed the crime and each points his finger at the other." 234 Kan. at 552.

*Martin* is clearly distinguishable from the case at bar. White and Falke were together in the commission of the crime. White's defense was that he did not fire the shots nor did he aid and abet Falke in committing the crime—he was merely present. Both defendants relied on the defense of intoxication to negate the specific intent required in attempted murder and aggravated kidnapping. It cannot be said that White's defense was inconsistent with that of Falke or that Falke's defense was intrinsically antagonistic to White. Their defenses placed both defendants at the scene, where they both possessed weapons. After the shooting they left the scene together in White's car with White driving. Eventually, they fled together to Las Vegas. This was not a case where each of the two defendants was trying to blame the other while trying at the same time to defend against the prosecution.

White argues that he was prejudiced from fully proving his defense of nonparticipation because he was unable to call defendant Falke to the stand to testify. He claims that had he been afforded a separate trial wherein he could have called Falke as a witness, Falke would have corroborated White's story as to his nonparticipation.

When two or more defendants are jointly tried, each defendant has a separate absolute right not to be called as a witness. *State v. Nott,* 234 Kan. 34, 669 P.2d 660 (1983). Therefore, White was barred from calling Falke unless Falke had waived his right not to be called. One of the grounds, previously stated, for which a trial court may grant severance is if a codefendant who could give exculpatory evidence for a defendant and who could be compelled to testify at the defendant's separate trial will not testify at the joint trial.

In *State v. Nott,* 234 Kan. at 39, the court quoted from 1 Wright, Federal Practice and Procedure: Criminal 2d § 225 (1982), wherein it was stated:

" 'In order to be entitled to a severance [for the purpose of obtaining the testimony of a codefendant], the movant must demonstrate: (1) a bona fide need for the testimony; (2) the substance of the testimony; (3) its exculpatory nature and effect; and (4) that the codefendant will in fact testify if the cases are severed.' "

In White's motion for separate trials, he did not assert "obtaining the testimony of a codefendant" as one of his grounds for requesting the severance. The defendant cannot raise a point on appeal that was not presented to the trial court. *State v. Kelly,* 204 Kan. 715, 716, 466 P.2d 350 (1970). Moreover, even if the defendant had raised this ground below, his arguments on appeal are no more than mere speculation. He has failed to show that defendant Falke would in fact testify, or—if he did—that he would give exculpatory testimony.

Defendant White further argues that the testimony against Falke was so great that it prejudiced the jury against him, thereby causing them to doubt the veracity of his testimony. Admittedly, White probably had a more difficult task of defending himself since he was tried with Falke. However, White made statements prior to the crime that he would need firearms to get his "stuff" back, and that he would shoot Ligons if he failed to return the stereo. White told Ligons on the morning of the crime that if he (Ligons) "messed up," he would use the rifle. White himself testified that he drove the car to a field and, once there, handed a rifle to Falke. After the crime, White told Peggy Shrum that he had killed a man. He then fled with Falke to Nevada, where he sold the gun used in the commission of the crime. A separate trial would not have changed this evidence.

We find the trial court did not abuse the exercise of its power of discretion in denying White's motion for a separate trial.

Defendant Falke also claims he was prejudiced by the court's denial of his motion for a separate trial. He alleges that he was prejudiced because his codefendant testified and he did not, making it appear to the jury that he had something to hide.

As previously noted, each codefendant in a joint trial has an absolute right not to be called as a witness. *State v. Nott,* 234 Kan. 34. This right may be waived. In the case at bar, White chose to waive his right not to testify and Falke did not. Falke's decision was part of his trial strategy.

The trial court instructed the jury that it should not consider the fact that Falke did not testify in reaching a verdict. We must assume the jury followed this instruction, thereby precluding Falke's failure to testify from having any prejudicial effect. *State v. Quinn,* 219 Kan. 831, 837-38, 549 P.2d 1000 (1976); *State v. Cameron & Bentley,* 216 Kan. at 648-49.

Falke also argues that he was prejudiced by the admission of hearsay statements of Peggy Shrum asserted by defendant White. Falke contends that this was "evidence incompetent as to one defendant and introducible against another [which worked] prejudicially to the former with the jury,"—the third ground (previously stated) for which a trial court may grant a severance.

Prior to the introduction of Peggy Shrum's testimony, the trial court gave the jury a limiting instruction that such testimony should only be used as to defendant White, and should not be considered as to defendant Falke. Peggy Shrum testified that White had told her that he had shot someone and was going to leave the state. White did not say anything to her about Falke, or Falke's involvement in the crime. Since her testimony did not implicate Falke it cannot be said to have had any prejudicial effect, especially in light of all of the other evidence against him. Moreover, we can assume the jury followed the limiting instruction. *State v. Pink,* 236 Kan. 715, 728, 696 P.2d 358 (1985).

We find that neither Falke nor White was prejudiced by the trial court's denial of their motions for separate trials. Therefore, we hold that the trial court did not err by denying the motions.

Defendant Falke next contends the trial court erred by excluding evidence contained in medical records which was proffered for the purpose of corroborating his defense of voluntary intoxication.

Falke sought to introduce testimony of a witness from the Midtown Alcoholic Rehabilitation Foundation, and records from that facility, which would show that Falke was a client of the facility until he was discharged on July 19, 1983, due to his being intoxicated. The records would have indicated that Falke had previously admitted use of "acid, Jack Daniels, pot and coke." His abuse began at the age of eleven. The date of his last use was May 17, 1983, and at that point in time he was put in the Osawatomie State Hospital and from there transferred to Midtown. The defense at trial argued the proffered evidence was "corroborative of the fact that the defendant was, indeed, utilizing that material on the days in question." The prosecution stipulated to the chain of custody of the medical records, but challenged them on the basis of irrelevancy and double hearsay. The defendant argued such records were admissible under ei-

ther K.S.A. 60-460(l) or (m). The trial court ruled that the proffered evidence was inadmissible because of its double hearsay nature and cited *State v. Davis*, 2 Kan. App. 2d 698, 587 P.2d 3 (1978), *rev. denied* 225 Kan. 846 (1979), as authority.

K.S.A. 60-460(l), the first hearsay exception upon which the defendant relies, provides:

"Unless the judge finds it was made in bad faith, a statement of the declarant's (1) then existing state of mind, emotion or physical sensation, including statements of intent, plan, motive, design, mental feeling, pain and bodily health, but not including memory or belief to prove the fact remembered or believed, when such mental or physical condition is an issue or is relevant to prove or explain acts or conduct of the declarant or (2) previous symptoms, pain or physical sensation, made to a physician consulted for treatment or for diagnosis with a view to treatment, and relevant to an issue of declarant's bodily condition."

We find the proffered evidence clearly does not fall under either 60-460(l)(1) or (2). The defendant's statements to the foundation's personnel about his past drug and alcohol use did not constitute a "then existing state of mind, emotion or physical sensation." K.S.A. 60-460(l)(1). Further, the defendant's conduct on September 10, 1983, was not induced or affected by the drugs or alcohol he consumed on or before May 17, 1983. Therefore, the defendant's hearsay statements do not fall under subsection (2) because they were not "relevant to an issue of declarant's bodily condition" at the time of the crime. K.S.A. 60-460(l)(2)

The defendant also argues that the records should have been admitted under the hearsay exception found in K.S.A. 60-460(m), which provides for admission of:

"Writings offered as memoranda or records of acts, conditions or events to prove the facts stated therein, if the judge finds that (1) they were made in the regular course of a business at or about the time of the act, condition or event recorded and (2) the sources of information from which made and the method and circumstances of their preparation were such as to indicate their trustworthiness."

This exception renders admissible hearsay statements of hospital personnel, but does not render admissible included hearsay statements unless the included statements themselves fall under a hearsay exception. K.S.A. 60-463.

In the case at bar, the defendant sought to introduce records which contained statements made by the defendant about his past drug and alcohol abuse. The records were offered to prove the truth of the defendant's statements. The defendant did not

proffer an independent basis for admitting the hearsay declarations contained in the record. Therefore, the trial court was correct in finding the medical records contained double hearsay and could not be admitted.

Even if the proffered records had fallen within a hearsay exception, we hold the evidence lacked relevancy to the issue of the defendant's intoxication at the time of the crime. The evidence of defendant's use of alcohol and drugs at the times in question was introduced through the testimony of several witnesses. Whether the defendant had abused alcohol or drugs in the past was not relevant in light of this evidence. The jury had before it evidence that the defendant had taken drugs prior to the crime. However, they found, based on the entirety of the evidence, that the defendant was still able to form the specific intent necessary to convict him of the crimes charged. The defendant was not prejudiced by the exclusion of the proffered testimony. Accordingly, we hold the trial court did not err in excluding this evidence.

Defendant Falke next contends that the repeated "exchanges" between his codefendant's counsel and the prosecutor prejudiced his right to a fair trial, and therefore the trial court erred by failing to declare a mistrial under K.S.A. 22-3423(1)(b) and (c) and by failing to order a separate trial for Falke.

In his motion for a mistrial, Falke's counsel stated:

"[The prosecutor] is reaching the point where he is continually making comments instead of legal objections, your Honor, has gotten upset at [defendant White's counsel]. I feel, the interest of my client is getting hurt over this, and I'm moving for a mistrial because of this diatribe between Counsel and Counsel, Counsel and the Court, and there is no way in the world that I can get a fair trial *if these comments continue to be made.*" (Emphasis added.)

The trial court overruled the motion for a mistrial and the renewed motion for a separate trial, but the court warned the prosecutor and White's counsel against further abuses.

From our review of the record, it appears that counsel complied with the trial court's admonitions because there were no further "exchanges." Moreover, defendant Falke did not renew his motion for mistrial, apparently due to the absence of any further problems.

The declaration of a mistrial under K.S.A. 22-3423 is a matter which lies within the trial court's discretion. *State v. McQueen & Hardyway,* 224 Kan. 420, 427, 582 P.2d 251 (1978). Discretion is

abused only where no reasonable man would take the view adopted by the court; if reasonable men could differ as to the propriety of the action taken by the court, then it cannot be said the trial court abused its discretion. *State v. Wilkins*, 220 Kan. 735, 556 P.2d 424 (1976).

A thorough review of the record was made. Most of the exchanges between the prosecutor and defendant White's counsel were personal remarks by the two counsel against one another relating to their attempts to introduce or exclude evidence. None of their statements demonstrated any ill will toward Falke or his counsel. Moreover, defendant Falke's counsel kept clear of the unnecessary exchanges. By so separating himself and his client, he took advantage of the situation in the eyes of the jury.

In *State v. Myrick & Nelms*, 228 Kan. at 416, this court found that belligerency or antagonism between defense counsel is insufficient to show the defendants have "antagonistic defenses" in order to warrant severance of trials. We now hold that antagonism between a codefendant's counsel and the prosecutor, which does not prejudicially affect the defendant, is not sufficient to warrant a separate trial for the defendant. Nor does it constitute a "legal defect" in the proceedings within the meaning of K.S.A. 22-3423(1)(b). Further, the conduct was not prejudicial so as to make it impossible to proceed without injustice to Falke within the meaning of K.S.A. 22-3423(1)(c).

Since the defendant failed to show he was actually prejudiced by conduct of counsel, we find the trial court did not abuse the exercise of its power of discretion in denying defendant Falke's motion for severance and his renewed motion for a separate trial.

The defendant White argues that his due process rights were violated when the prosecutor sought to impeach his testimony with his pretrial, post-*Miranda* statement which had been previously introduced by the defense. To understand the defendant's contention, a brief review of the facts surrounding this issue is warranted.

The State called David Hatch, a Las Vegas police detective, as a witness. The prosecutor questioned Detective Hatch about the defendant's arrest and the events surrounding it. On cross-examination, White's counsel expanded the scope of the examination by questioning the witness as to statements he had over-

heard White make to another police officer while at the police station.

Detective Hatch testified to having overheard the following:

"Detective McGuckin was inquiring if he [White] would issue a voluntary statement reference his activities or possible involvement in this crime in the State of Kansas. He indicated that he preferred to have an attorney prior to making any statement and he made some type of statement, I couldn't give it verbatim, that he was too stoned to really remember, and that is about all I can remember of the thing."

Over the prosecutor's objection, Detective Hatch was allowed to read from the other officer's report, as follows:

" 'Steven White, after having been given his constitutional rights per *Miranda,* made admissions to Detective McGuckin in reference to the crime that they were arrested for. White stated that both he and Richard Falke were under the influence of drugs and alcoholic beverage since Friday, which would have been 9-9-83.

. . . .

" 'He related they went to a person's house and while they were in the house their vehicle had been broken into and a stereo radio and purse were stolen.

. . . .

" 'White stated that he knew who had been responsible for the theft and that when they approached this person later while they were under the influence, something must have happened. Exactly what happened he did not recall. He stated then that both he and Richard Falke had left Kansas. White stated that they had gone out target shooting and someone had been shot. However, he does not recall when or where.' "

Later, the defense called White as a witness. On direct examination, he testified in some detail about the events leading up to and surrounding the crime. He claimed the shooting was an accident and that he was not involved in any way, other than being present. He made no mention of being unable to remember what had happened.

On cross-examination, White claimed that because of his "conscience" he had decided to turn himself in just prior to his arrest. The prosecutor asked White if he believed he had been given an opportunity to tell his story in his statement to Las Vegas authorities. White said that he had, but that he failed to exercise the opportunity because he was scared. The prosecutor then asked, "You lied to them, didn't you?" After an objection the court called the attorneys to the bench where the prosecutor was warned that he was "on dangerous ground" and needed to change his tactics. White's counsel then argued that the prosecutor had impermissibly commented upon the defendant's legal

rights, but the court responded by noting, "Well, you brought that out."

On appeal, White argues that the prosecutor used defendant's post-arrest, post-*Miranda* silence to impeach the defendant's credibility in contravention of the rule set out in *Doyle v. Ohio*, 426 U.S. 610, 49 L.Ed.2d 91, 96 S.Ct. 2240 (1976), and adopted by this court in *State v. Mims*, 220 Kan. 726, 730, 556 P.2d 387 (1976), wherein we stated:

"We interpret the decision of the United States Supreme Court in *Doyle* to settle the question so as to make it constitutionally impermissible for a state prosecutor to impeach a defendant's exculpatory story told for the first time at the trial by cross-examining him as to his post-arrest silence after receiving the warnings required by *Miranda v. Arizona*, 384 U.S. 436, 16 L.Ed. 2d 694, 86 S.Ct. 1602 [1966]."

The *Doyle* rule does not apply to the situation presented in the case at bar for two reasons. First, the defendant was not silent. He made a statement to the police that he was too drunk to remember what had happened. Stating that he couldn't remember is clearly not the same as being silent. Therefore, when the defendant made a different statement at trial—he testified in detail to the events, thus indicating that he remembered what happened—the prosecutor could properly impeach him with his prior inconsistent statement. K.S.A. 60-422(b).

The second reason *Doyle* does not apply is that the defendant originally introduced the statements which he later objected to when the prosecutor sought to use them to impeach the defendant. The defendant may not invite error and then complain of that error on appeal. *State v. Reynolds*, 230 Kan. 532, 535-36, 639 P.2d 461 (1982).

The defendant places great stock in the trial court's warning to the prosecutor that he had entered upon "dangerous ground." It appears that the trial court was referring to the argumentative tone of the question, rather than the prosecutor's use of the prior statement to impeach the defendant.

The defendant's argument that he was denied due process is wholly without merit.

Finally, both defendants contend that the trial court erred in failing to sustain their motions for judgment of acquittal. They argue that the court should have concluded, as a matter of law, that due to their intoxication they were incapable of forming the specific intent to commit the crimes with which they were charged.

A trial judge in passing on a motion for judgment of acquittal must determine whether, upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence; and draw justifiable inferences of fact therefrom, a reasonable mind, or rational trier of facts, might fairly conclude guilt beyond a reasonable doubt. *State v. Fosnight,* 235 Kan. 52, 53, 679 P.2d 174 (1984); *State v. Mack,* 228 Kan. 83, 89, 612 P.2d 158 (1980). When the sufficiency of evidence is questioned on appeal, a similar standard is used. The appellate court must be convinced that when the evidence is viewed in the light most favorable to the prosecution, a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Pham,* 234 Kan. 649, 667-68, 675 P.2d 848 (1984).

K.S.A. 21-3208(2) provides:

"An act committed while in a state of voluntary intoxication is not less criminal by reason thereof, but when a particular intent or other state of mind is a necessary element to constitute a particular crime, the fact of intoxication *may be taken into consideration in determining such intent or state of mind.*" (Emphasis added.)

The defendants were charged with committing attempted first-degree murder (K.S.A. 1984 Supp. 21-3301; K.S.A. 21-3401) and aggravated kidnapping (K.S.A. 21-3421). The jury was also instructed on the lesser included offenses of attempted second-degree murder (K.S.A. 1984 Supp. 21-3301; K.S.A. 21-3402) and kidnapping (K.S.A. 21-3420). Each of these crimes required a specific intent to commit the crime. The jury was also instructed on aiding and abetting (K.S.A. 21-3205). In order to be found guilty as a principal due to having aided and abetted another, a defendant must have had the specific intent to have willingly and knowingly associated himself with the criminal acts of another and to have willingly participated in them.

The defendants attempted to present evidence at the trial to show a level of intoxication sufficient to negate specific intent to commit the crimes. However, although the defendants did show they had indulged in intoxicating beverages and drugs, they failed to show a level of intoxication such that they were "utterly devoid of consciousness or awareness" of what they were doing. *State v. Masqua,* 210 Kan 419, 425, 502 P.2d 728 (1972), *cert. denied* 411 U.S. 951 (1973). The evidence showed that defendant

White remembered the events before, during, and after the crime in some detail. Both defendants had told witnesses that they knew Ligons had stolen their stereo and they planned to get it back. Defendant White was able to drive a car without mishap and defendant Falke was able to direct him. Both defendants were aware of what they had done and told various witnesses about the crime. They apparently realized that what they had done was wrong as evidenced by their flight to Las Vegas, where they sold their guns. All of this evidence indicated that the defendants' "intoxication" did not affect their abilities to reason, to plan, to recall, or to exercise their motor skills.

After presentation of this evidence, the issue concerning the level of intoxication was a question for the trier of fact. *State v. Miles*, 213 Kan. 245, 515 P.2d 742 (1973). Therefore, the trial court did not err by refusing to hold, as a matter of law, that the defendants were incapable of forming the specific intent due to their intoxication. The motions for judgment of acquittal were properly denied.

The jury, after being properly instructed (PIK Crim. 2d 54.12) on the issue of intoxication, resolved the issue against the defendants and its determination thereof will not be disturbed.

The judgment of the lower court is affirmed.