(740 P.2d 617)

No. 59,839

STATE OF KANSAS, *Appellee*, v. LAWRENCE WALDSCHMIDT, JR., *Appellant*.

Petition for review denied September 9, 1987.

Opinion filed July 30, 1987.

*Glenn R. Braun*, of Glassman, Bird & Braun, of Hays, for the appellant.

*David O. Baumgartner*, of Sullivan & Sullivan, of Phillipsburg, *Paul R. Oller*, assistant county attorney, and *Robert T. Stephan*, attorney general, for the appellee.

Before BRISCOE, P.J., WILLIAM D. CLEMENT, District Judge, assigned, and WILLIAM M. COOK, District Judge, assigned.

BRISCOE, J.: This is a direct appeal by Lawrence Waldschmidt, Jr., from his jury conviction of possession of marijuana with intent to sell (K.S.A. 1986 Supp. 65-4127b[a][3]) and possession of drug paraphernalia (K.S.A. 65-4152[2]).

The sole issue on appeal is whether the trial court erred in denying defendant's motion to suppress evidence seized pursuant to a search warrant.

At a hearing on defendant's motion to suppress, Sheriff J. Dean Ochs of Trego County related the facts leading up to the execution of the search warrant. According to Sheriff Ochs, it was rumored in the community that defendant and his brother were growing marijuana at their residence located at the edge of the

small rural village of Ogallah, in Trego County. These rumors and the sheriff's investigation were based on the fact that defendant and his brother had constructed a six-foot high fence around their yard. This yard was behind and immediately adjacent to their residence.

Sheriff Ochs and a deputy went to defendant's property on July 25, 1985, at approximately 10:30 to 11:00 p.m. They walked up to defendant's fence by crossing a neighboring pasture, which was surrounded by a three- or four-strand barbed wire fence. The fence surrounding defendant's yard was a wooden stockade-type fence. The boards in the fence were placed closely together and obstructed the view of defendant's yard. In order to see into defendant's yard, Sheriff Ochs climbed the adjacent barbed wire fence by balancing himself against defendant's fence. From this vantage point, the sheriff was able to place his arm and flashlight approximately one foot over defendant's fence and peer down at the contents of defendant's yard. Sheriff Ochs testified he was able to observe approximately 15 marijuana plants, which were three to four feet tall, growing in the yard. The sheriff then climbed down and he and his deputy left the area.

The sheriff and his deputy returned to defendant's property a month later on the night of August 26, 1985. They again walked through the neighbor's pasture and the sheriff climbed the barbed wire fence and again observed defendant's yard, which still contained growing marijuana. After this second observation, the sheriff prepared and signed a warrant application and an affidavit in support of his warrant application. Upon presentation of the application and affidavit to the magistrate judge, the judge found there was probable cause to believe the enumerated crimes were being committed and she issued a search warrant.

The warrant was executed on August 28, 1985. Defendant's residence and backyard were searched. Among the items seized were growing lights, planters containing growing marijuana plants, garden hoses, peat moss, potting soil, and a tiller, as well as cash, bank and travel records, and processed marijuana. During the search, 120 marijuana plants were recovered, 49 of which were located in the fenced-in area of the yard.

Prior to trial, defendant moved to suppress all evidence seized pursuant to the warrant. The motion was denied and the evi-

dence was admitted at trial. The defendant was convicted of possession of marijuana with intent to sell and possession of drug paraphernalia, based on evidence recovered in the search of defendant's property.

Defendant contends the sheriff's looking and reaching over defendant's fence in July and August 1985 were warrantless searches, in violation of his Fourth Amendment rights. Defendant also contends his Fourth Amendment rights were again violated when the sheriff executed the warrant which was based upon information obtained from the two prior warrantless searches.

We will focus our analysis upon the two warrantless observations, for if they violated defendant's Fourth Amendment rights, the subsequent warrant was improperly issued because the only probable cause basis for the warrant was the sheriff's observations.

"[T]he exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure [citation omitted], but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.' [Citation omitted.]" *Segura v. United States*, 468 U.S. 796, 804, 82 L. Ed. 2d 599, 104 S. Ct. 3380 (1984).

See *Wong Sun v. United States*, 371 U.S. 471, 484, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963); *Nardone v. United States*, 308 U.S. 338, 341, 84 L. Ed. 307, 60 S. Ct. 266 (1939); *Weeks v. United States*, 232 U.S. 383, 58 L. Ed. 652, 34 S. Ct. 341 (1914).

At the suppression hearing, the sheriff also testified that the growing marijuana on the other side of the fence emitted an odor which he smelled and could identify as unique to growing marijuana without actual observation of the plants. Had the sheriff also included this fact in his warrant application, it would have provided a potential alternative probable cause basis for upholding the constitutionality of the warrant. But, this fact was not included in the warrant application or otherwise presented to the court issuing the warrant; therefore, it cannot be used retroactively to correct the warrant. *Katz v. United States*, 389 U.S. 347, 19 L. Ed. 2d 576, 88 S. Ct. 507 (1967).

At the close of the suppression hearing, the trial court stated the following as its rationale for denying defendant's motion to suppress:

"What Sheriff Ochs did in this case was essentially stand on a barbed wire fence and use his flashlight to look over a wooden fence. The Court is going to find that was justifiable constitutionally, either under the open field plain view doctrine, or based upon the probable cause testimony as to the odor of growing marijuana plants."

As we have stated, since the sheriff did not include his detection of an odor of growing marijuana as a probable cause basis for obtaining the warrant, neither we nor the trial court can now rely on it to sustain the warrant.

Can the sheriff's observation of defendant's backyard be upheld under either the open field or plain view doctrines? We think not.

As a preliminary to our legal analysis, we must first discount the State's factual argument that the building adjoining the yard in question was not defendant's residence. Since this contention is raised for the first time on appeal, we need not consider it. *State v. Falke*, 237 Kan. 668, 676, 703 P.2d 1362 (1985). Further, even if considered, both the affidavit in support of the warrant application and the affidavit of prosecution filed on behalf of the State indicated the State believed the adjoining building was in fact the residence of Lawrence Waldschmidt and his brother George. No evidence was presented to the contrary.

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." The amendment protects people, not places, and is aimed at the preservation of the individual's reasonable expectation of privacy. *Katz*, 389 U.S. at 351-53; *State v. Baker*, 239 Kan. 403, 406, 720 P.2d 1112 (1986). The amendment does not protect the merely subjective expectation of privacy, but only those expectations "that society is prepared to recognize as 'reasonable.'" *Katz*, 389 U.S. at 361 (Harlan, J., concurring); see *Smith v. Maryland*, 442 U.S. 736, 740-41, 61 L. Ed. 2d 220, 91 S. Ct. 2577 (1979). To resolve whether any given expectation of privacy is reasonable, *Katz* provides a two-part inquiry: First, has the individual manifested a subjective expectation of privacy in the object of the challenged search? Second, is society willing to recognize that expectation as reasonable? *Katz*, 389 U.S. at 361; see *Smith*, 442 U.S. at 740-41.

Since the passage of the Fourth Amendment, our Supreme Court has stressed "the overriding respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic." *Payton v. New York*, 445 U.S. 573, 601, 63 L. Ed. 2d 639, 100 S. Ct. 1371 (1980). See *United States v. United States District Court*, 407 U.S. 297, 313, 32 L. Ed. 2d 752, 92 S. Ct. 2125 (1972); *Silverman v. United States*, 365 U.S. 505, 511, 5 L. Ed. 2d 734, 81 S. Ct. 679 (1961). The "curtilage," the land immediately surrounding and associated with the home, is given the same Fourth Amendment protections that attach to the home. *Oliver v. United States*, 466 U.S. 170, 180, 80 L. Ed. 2d 214, 104 S. Ct. 1735 (1984); *State v. Mitchell*, 8 Kan. App. 2d 265, 268, 655 P.2d 140 (1982). At common law, the curtilage is the area to which extends the intimate activity associated with the "sanctity of a man's home and the privacies of life" (*Boyd v. United States*, 116 U.S. 616, 630, 29 L. Ed. 746, 6 S. Ct. 524 [1886]), and therefore has been considered part of the home itself for Fourth Amendment purposes. The courts have continued to extend Fourth Amendment protection to the curtilage, and they have defined the curtilage, as did the common law, by reference to the factors that determine whether an individual reasonably may expect that an area immediately adjacent to the home will remain private. *Oliver v. United States*, 466 U.S. at 180.

Open fields, on the other hand, are not afforded the same Fourth Amendment protection as is afforded the curtilage. In *Oliver*, 466 U.S. at 178, the Supreme Court upheld *Hester v. United States*, 265 U.S. 57, 68 L. Ed. 898, 44 S. Ct. 445 (1924), and observed: "[A]n individual may not legitimately demand privacy for activities conducted out of doors in fields, except in the area immediately surrounding the home." In explanation of its rationale for this conclusion, the court contrasted open fields to the curtilage and stated "open fields do not provide the setting for those intimate activities that the Amendment is intended to shelter from government interference or surveillance." *Oliver*, 466 U.S. at 179. In addressing the first inquiry under *Katz*, the court concluded that no expectation of privacy legitimately attaches to open fields; an individual has no legitimate expectation that open fields will remain free from warrantless intrusion by government officers. Further, under the second *Katz* inquiry,

"[t]here is no societal interest in protecting the privacy of those activities, such as the cultivation of crops, that occur in open fields. Moreover, as a practical matter these lands usually are accessible to the public and the police in ways that a home, an office, or commercial structure would not be." *Oliver*, 466 U.S. at 179.

Whether an area is subject to protection under the curtilage concept is determined by reference to four factors: "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." *United States v. Dunn*, 480 U.S. 273, 94 L. Ed. 2d 326, 334-35, 107 S. Ct. 1134, *reh. denied* 481 U.S. 1024 (1987). In considering these factors, the Court stated:

"We do not suggest that combining these factors produces a finely tuned formula that, when mechanically applied, yields a 'correct' answer to all extent-of-curtilage questions. Rather, these factors are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration—whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Dunn*, 480 U.S. at 301.

Applying these factors to the present case, we conclude that defendant's fenced yard was within the curtilage. First, the record indicates the yard was in that area immediately adjacent to the house. Second, the yard was surrounded by a six-foot high fence. Third, viewed objectively, the fenced area was *of the type* used for intimate family activities. This conclusion is debated by the State. Fourth, defendant evidenced a subjective expectation of privacy by erecting a six-foot high fence which shielded the area from the view of people passing by.

The State argues that the fenced yard is not within the definition of curtilage because it was being used for illegal activities rather than intimate family activities. This argument is not persuasive. In *Oliver*, 466 U.S. at 181, the Supreme Court refused to do a case-by-case analysis to ascertain whether, on occasion, an individual's expectation of privacy in a certain activity in an open field should be protected.

"This Court repeatedly has acknowledged the difficulties created for courts,

police, and citizens by an ad hoc, case-by-case definition of Fourth Amendment standards to be applied in differing factual circumstances. [Citations omitted.] The ad hoc approach not only makes it difficult for the policeman to discern the scope of his authority [citation omitted]; it also creates a danger that constitutional rights will be arbitrarily and inequitably enforced. [Citation omitted.]" 466 U.S. at 181-82.

In *Dunn*, it is apparent that, from the Court's analysis of whether a barn located within a fenced area was of the type used for intimate family activities, the Court embarked on a "case-by-case" analysis. In concluding the barn was not within the curtilage of the house for Fourth Amendment purposes, the Court relied upon abundant objective data that indicated the barn was not being used as part of defendant's home. The dissent cited *Oliver* and criticized this approach. The dissent argued that, since the Court is willing to generalize about the *absence* of a privacy interest in open fields, it should be equally willing to generalize about the *existence* of a privacy interest in a barn near a residence. The dissent argued the general rule that a barn is a domestic use should apply, and the application of this general rule should end the inquiry concerning the nature of the use of the area. Typical use rather than actual use should control.

Assuming the *Dunn* decision authorizes a case-by-case determination, the facts in the present case can be distinguished. Here, the bulk of the objective evidence indicated the yard in question was within the curtilage. The yard was within close proximity of defendant's residence and it was shielded with a high fence. Most evidence to the contrary was obtained after the sheriff's intrusion. The only evidence obtained prior to the intrusion which suggested the yard was being used to grow marijuana was the sheriff's indication he smelled growing marijuana. Such evidence is not overly compelling and is tainted by the fact the sheriff never reported until the suppression hearing that he smelled growing marijuana before he climbed up and looked over the fence.

A determination that defendant's fenced yard was within the curtilage does not end the inquiry. While the curtilage is entitled to a *higher* degree of Fourth Amendment protection, it is not free from all warrantless searches. In *California v. Ciraolo*, 476 U.S. 207, 90 L. Ed. 210, 106 S. Ct. 1809 (1986), acting on an

anonymous tip, police officers who were trained in marijuana identification secured a private airplane, flew over defendant's fenced backyard at an altitude of 1000 feet, and readily identified marijuana growing in the yard. The United States Supreme Court held that a warrantless search of a curtilage made by such aerial surveillance was not improper because defendant had no reasonable expectation of privacy from this type of observation. In support of its conclusion, the Court found the aerial surveillance was conducted from navigable airspace and was therefore a public vantage point.

The State in the present case argues that *Ciraolo* is controlling. The State contends the sheriff's observations were made from a public vantage point, as anyone could climb the adjacent barbed wire fence and peer into defendant's backyard. According to the State, defendant could have no reasonable expectation of privacy in this regard. The State's interpretation of *Ciraolo* is far too broad. If the State's position were adopted, the curtilage doctrine would be meaningless. The facts in the present case can be distinguished from *Ciraolo* based on the intrusiveness of the search. In *Ciraolo*, the Supreme Court noted that the search was physically nonintrusive. The search in the present case, on the other hand, was intrusive. The sheriff climbed a neighbor's fence, balanced himself against defendant's fence, and placed his arm and flashlight over the fence to make his observations. While an individual may have no reasonable expectation of privacy as to aerial overflights at 1000 feet, it is reasonable to expect that people will not scale your fence to observe the contents of your yard. In this regard, we conclude the sheriff's conduct violated defendant's reasonable expectation of privacy.

Our conclusion is further bolstered by a statement made in the dissent of *Ciraolo*, which first noted its agreement with the majority that defendant's yard was in fact within the curtilage and then stated:

"The lower federal courts have agreed that the curtilage is 'an area of domestic use immediately surrounding a dwelling and usually but not always fenced in with the dwelling.' [Citations omitted.] . . . Relevant facts include the proximity between the area claimed to be curtilage and the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by. [Citations omitted.]

. . . .

". . . Since Officer Shutz could not see into this private family area from the street, the Court certainly would agree that he would have conducted an unreasonable search had he climbed over the fence, or used a ladder to peer into the yard without first securing a warrant. [Citations omitted.]" 476 U.S. at 221-22.

Finally, the plain view doctrine cannot legitimize the sheriff's conduct. The plain view doctrine allows law enforcement officers to seize evidence without a warrant if it is within plain view. *Coolidge v. New Hampshire*, 403 U.S. 443, 29 L. Ed. 2d 564, 91 S. Ct. 2022 (1971). To invoke the plain view doctrine, the law enforcement officer must discover the evidence inadvertently while in a place where he has a right to be present. *Coolidge*, 403 U.S. at 465. See *Texas v. Brown*, 460 U.S. 730, 75 L. Ed. 2d 502, 103 S. Ct. 1535 (1983). The sheriff's observations in the present case do not meet the plain view doctrine because the sheriff's observations were not inadvertent nor, as discussed above, made from a location where the sheriff had a right to be. The plain view doctrine cannot apply unless the officer's initial presence is justified.

The sheriff's conduct was a violation of defendant's Fourth Amendment rights and the subsequent warrant was improperly issued because the only probable cause basis for the warrant was the sheriff's observations.

Reversed and remanded for new trial.

CLEMENT, J., dissenting: The majority factually finds that a sheriff climbing on a neighbor's fence and thrusting his flashlight through the plane of the curtilage to peer at a growing crop of marijuana is so much more intrusive than peering at a crop of marijuana within the curtilage from a light plane flying overhead, that following *California v. Ciraolo* is excused. The distinction, if it exists, does not justify a conclusion different from that reached in *Ciraolo*.

*Ciraolo* should be followed and the trial court should be affirmed.