No. 58,828

STATE OF KANSAS, *Appellee*, v. ARNOLD L. RUEBKE, JR., *Appellant*.

(731 P.2d 842)

494

Opinion filed January 16, 1987.

*Richard J. Rome,* of Hutchinson, argued the cause and was on the brief for appellant.

*Francis E. Meisenheimer,* assistant county attorney, argued the cause, and *Robert T. Stephan,* attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: The defendant was found guilty by a jury of three counts of first-degree murder and three counts of aggravated kidnapping. We affirm the convictions.

James and Deborah Vogelsang lived approximately one mile from Arlington, Kansas, with their two daughters and two-year-old twin boys. The boys' babysitter, Tammey Mooney, lived in a trailer across from the Arlington Grade School. On October 29, 1984, Deborah Vogelsang reported to the Reno County Sheriff's Department that her two-year-old twin sons and their babysitter were missing.

Three days later their bodies were found by an Arlington resident in a thickly wooded and grassy area west of Arlington and north of the Vogelsang residence. All three had been shot with a 12-gauge shotgun. One child had been shot once, the second child had been shot twice, and Tammey Mooney had been shot four times.

On November 4, 1984, the defendant, Arnold L. Ruebke, Jr., was arrested and charged with three counts of first-degree murder and three counts of aggravated kidnapping.

The evidence presented to the jury established the following events. On October 29, 1984, Deborah Vogelsang left for work at approximately 5:30 a.m. Just prior to 7:30 a.m., Tammey Mooney arrived at the Vogelsang home to babysit with the twins. James Vogelsang then left for work.

About 9:00 a.m. that morning, Arnold Ruebke requested $1.40 worth of gasoline at a service station. The owner of the service station accidently ran the pump to $1.65. Ruebke had only $1.56 in change to pay for the gasoline. Later that morning, Ruebke told the City Clerk that he would have money to pay his outstanding traffic fines. That afternoon, Ruebke purchased an additional $6.40 worth of gasoline and oil. He cashed in $4.34 in change at an Arlington bank; the change included two nickels, a 1941 Mercury dime, and the balance in pennies. Some of the

pennies were wheat pennies and a few were corroded. Shortly before 1:00 p.m., Ruebke paid $5.00 on his traffic fines. Later that afternoon, Ruebke returned a 12-gauge shotgun and some shells he had borrowed previously to a friend in Kingman, Kansas.

At approximately 6:00 p.m., Mr. Vogelsang returned home. The boys and the babysitter were missing. Also missing was a bag that had contained pennies, a few of which were corroded and some of which were wheat pennies; one or two nickels; and a 1941 Mercury dime. Tammey's trailer was checked. Missing from her trailer was $15.00. Her coat that she had worn to babysit that morning had been returned to her trailer.

On October 30, law enforcement officers interviewed three children who, on the day of the victims' disappearance, had seen the victims with Arnold Ruebke between 11:30 a.m. and noon. The three children, Kevin Sipe, Kerri Shelite, and Monica Johnson, attended Arlington Grade School. During recess the children had seen the victims in Ruebke's car near Tammey's trailer, which could be seen from the school. The children recognized Ruebke's car because it was unique—a black Mustang automobile with horses portrayed on the rear window. Mooney's presence in the car was later substantiated by the testimony of Larry Morris, a KBI forensic examiner, who determined that a known head hair sample of Tammey Mooney matched a hair found on the right rear floorboard of the defendant's vehicle.

On the evening of November 1, the bodies of the victims were found in a thickly wooded and grassy area to the north of the Vogelsang residence. To protect the evidence, the crime scene was not processed until the next morning. Evidence revealed that the bodies had not been moved after they had been shot. Hugh Kizer, a criminalist from the KBI, testified that the shot taken from the bodies of the boys was consistent with No. 6 shot, that the shot taken from Mooney's body was No. 7 ½ shot, and that shotgun shell shot caps taken from the scene and the bodies of the victims came from a 12-gauge shotgun. As the investigation progressed, it was learned that on October 29 the defendant returned to its owner a 12-gauge shotgun and Federal No. 6 game load shotgun shells. Later, an analysis of the samples taken from those No. 6 game loads revealed they contained a fiber wadding similar to the fiber wadding found in the bodies of the victims.

On the evening of November 2, 1984, Ruebke told an individual that his father was chief of police of Arlington, Kansas, and that he had helped his father carry the bodies out of the woods. He described the type and the location of the wounds of each victim. Ruebke's father was not a law enforcement officer. At that time, the details of the type and location of the wounds had not been released to the public.

At trial, the State introduced the testimony of Greg Fountain, the former chief of police of Arlington. Fountain related a conversation he had had with the defendant in May of 1984. Fountain had explained to Ruebke that if one were planning a murder, it was better to use a shotgun because the shot could not be traced through ballistics. They had also discussed using isolated, woody areas for disposing of bodies, and that the bodies should be left on top of the ground to decompose and allow the remains to be scattered by scavengers.

At his trial, Ruebke's testimony contradicted his earlier statements to the authorities. Ruebke, attempting to establish an alibi for the noon hour of the fateful day, testified that on that day he had attempted to make purchases at a certain business in South Hutchinson during the lunch hour, but it was closed. This testimony was contradicted by the store's personnel. The jury found Ruebke guilty on all counts. He appeals.

## 1. Sufficiency of the Evidence

Ruebke had moved for acquittal at the close of the State's case, upon final submission of the case, and after the verdict. He contends the State had failed to produce sufficient evidence to establish that he had committed the crimes charged and the trial court erred by not granting his motions for acquittal.

When renewing Ruebke's motion for acquittal after final submission of the case, the court was free to consider all the evidence. A trial judge, in passing on a motion for judgment of acquittal at the close of the evidence, must determine whether upon the evidence a reasonable mind might fairly conclude guilt beyond a reasonable doubt. *State v. Falke,* 237 Kan. 668, Syl. ¶ 9, 703 P.2d 1362 (1985).

The State's evidence in this case was circumstantial. On appeal, when considering the sufficiency of circumstantial evidence to sustain a conviction of a crime, the question is not whether the evidence is incompatible with any reasonable hy-

pothesis except guilt; that question is for the jury and trial court. The appellate court must be convinced that when the evidence is viewed in the light most favorable to the prosecution, a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Taylor,* 234 Kan. 401, 409, 673 P.2d 1140 (1983).

Under that standard of review, there was sufficient evidence to find the defendant guilty beyond a reasonable doubt. The court did not err in denying the motions for acquittal.

## 2. The Preliminary Hearing Transcript

After the preliminary examination, the defendant's attorney requested that the court order a transcript of that proceeding to be given to defendant. The judge denied the request. The defendant contends it was prejudicial error to deny him a transcript.

A defendant has no absolute right to a transcript of a hearing. The State must provide an indigent defendant with a transcript of prior proceedings when the transcript is needed for an effective defense. Two factors are relevant to the determination of need: (1) the necessity of the transcript to the defendant, and (2) the availability of alternative devices that would fulfill the same functions as a transcript. *State v. Hornbeak,* 221 Kan. 397, 559 P.2d 385 (1977).

The denial of a transcript of a hearing to an indigent defendant must be examined carefully by an appellate court. The appellate court must determine from the facts of each case if there was an actual need for the transcript.

Here, Ruebke had the same counsel at both the preliminary examination and the trial. The court reporter was available and, in fact, did testify during the trial at the request of the defendant. Prior to trial, the State provided investigative reports from law enforcement agencies to the defendant. Further, the court appointed an investigator at the request of the defendant to aid in preparation for trial. Under the circumstances, it was not an abuse of discretion to deny the defendant a transcript of the preliminary examination.

## 3. Bail

Ruebke claims that the judge's failure to reduce his bail from $100,000 impaired his defense. The State argues that the bail issue is moot because the defendant did not file a writ of habeas corpus and prior to trial he was released on bail.

K.S.A. 22-2802(4) provides:

"In determining which conditions of release will reasonably assure appearance, the magistrate shall, on the basis of available information, take into account the nature and circumstances of the crime charged, the weight of the evidence against the defendant, the defendant's family ties, employment, financial resources, character and mental condition, the length of said defendant's residence in the community, said defendant's record of convictions, and said defendant's record of appearance at court proceedings or of flight to avoid prosecution or failure to appear at court proceedings."

No hard and fast rule can be laid down for fixing the amount of bail on a criminal charge. Each case must be governed by its own facts and circumstances. *State v. Foy,* 224 Kan. 558, 562, 582 P.2d 281 (1978). Bail is excessive when it is set at an amount higher than necessary to insure appearance of the accused at trial. *Meechaicum v. Fountain,* 696 F.2d 790 (10th Cir. 1983).

When a defendant alleges on appeal error in the fixing of bail, but fails to file a writ of habeas corpus and does not claim his defense was hampered by his custody status, the matter of pretrial release is moot. *State v. Foy,* 224 Kan. 558, Syl. ¶ 1.

Ruebke claims that the fact that he could not be released earlier limited his ability to prepare his defense, but he does not explain how. For a defendant to successfully claim that his rights were violated because he was unable to make bail, it is necessary to allege how the confinement deprived him of a right or hampered his defense.

The amount of bond in this case was not excessive. Ruebke was charged with six Class A felonies. He was unemployed and on probation for another felony conviction. There was no abuse of discretion by the trial court in refusing to lower Ruebke's bail.

### 4. Change of Venue

Because of the pretrial publicity of the murders, Ruebke contends the trial court erred in failing to grant his motion for change of venue. He argues that news media treatment and coverage of the crime was so extensive that justice required the trial to be moved to a different area in Kansas.

The determination of whether to change venue lies within the sound discretion of the trial court and will not be disturbed on appeal absent a showing of prejudice to the substantial rights of the defendant, with the burden upon the defendant to show prejudice in the community, not as a matter of speculation, but as

a demonstrable reality. *State v. Haislip,* 237 Kan. 461, 701 P.2d 909 (1985). The defendant must show that such prejudice exists in the community that it was reasonably certain he could not have obtained a fair trial. There must be more than speculation that the defendant did not receive a fair trial. The State is not required to produce evidence refuting that of the defendant. *State v. Sanders,* 223 Kan. 273, 280, 574 P.2d 559 (1977).

At the hearing on the defendant's original motion for change of venue, he called 24 witnesses who testified that the defendant could not receive a fair trial in Reno County. He also filed 35 similar affidavits from residents stating that they did not believe the defendant could receive a fair and impartial trial. In addition, the defendant offered 12 exhibits consisting of copies and tapes of radio and television broadcasts, and copies of numerous newspaper and wire service accounts of the murder. At the hearing on the defendant's second motion for change of venue, he introduced the same testimony and a copy of a national magazine, "Startling Detective." The magazine had been circulated widely in the Reno County area and contained the story, "Killer Who Came Straight From Hell," which discussed Ruebke and the murders.

Obviously, there was an enormous amount of publicity concerning the murders in the Arlington area. Unfortunately, there was no place in this state that the facts of the murders and the arrest of the defendant were not known. Modern communication and network methods for distribution of news allow the news media to distribute information by newspaper, radio, and television to the public statewide. News of the murders and the investigation was not, nor could be, limited to the Arlington area. Because of the tragic murder of the twins and their babysitter, the news of that happening was immediately spread throughout Kansas as each fact surrounding their disappearance and death was uncovered.

Indicative of whether the atmosphere is such that a defendant's right to a fair and impartial trial would be jeopardized, courts have looked at such factors as the particular degree to which the publicity circulated throughout the community; the degree to which the publicity or that of a like nature circulated in other areas to which venue could be changed; the length of time which elapsed from the dissemination of the publicity to the date

of trial; the care exercised and the ease encountered in the selection of the jury; the familiarity with the publicity complained of and its resultant effect, if any, upon the prospective jurors or the trial jurors; the challenges exercised by the defendant in the selection of a jury, both those preemptory and those for cause; the connection of government officials with the release of the publicity; the severity of the offense charged; and the particular size of the area from which the venire is drawn. Annot., 33 A.L.R. 3d 17, § 2(a).

It took two days to select the jury for this case. On the first day, two members of the jury panel were struck because one knew Ruebke's mother and one had a daughter coming for a visit and could not give her full attention to the trial. On the second day of jury selection, eleven panel members were dismissed because: (1) one was a social friend of the defendant's attorney; (2) one worked with the sheriff's cousin and had discussed the facts of the case with him; (3) one knew the defendant's wife and had discussed the case with her; (4) three of the panel members knew witnesses that would testify in the trial and admitted that they would give added weight to that testimony; (5) one's personal beliefs would not allow her to judge another; (6) one had knowledge that the defendant had stolen $40.00 from one of her friends prior to the trial; and (7) three of the panel admitted they had read about the murders and could not separate that information from the evidence presented during the trial. On the third day the judge selected two alternate jurors. Five members of the jury panel were dismissed from jury duty: two because of newspaper stories and three because of rumors and gossip.

Media publicity alone has never established prejudice per se. The trial court had no difficulty in finding from the jury panel jurors who stated that they could render a fair and impartial verdict. The small number of jurors dismissed by the court for cause and the effort of the judge to press no one into jury service who showed the slightest hint of prejudice established that there was no abuse of discretion in denying a change of venue. Unless we are to assume that (1) the jurors selected to try the defendant violated their oath when they swore that they could give the defendant a fair trial or (2) an individual can commit a crime so heinous that news coverage generated by that act will not allow the perpetrator to be brought to trial, the defendant has not

established substantial prejudice. There was no abuse of discretion on the part of the court in denying the defendant's motion for change of venue.

## 5. Recusal

Ruebke complains that the court erred in denying his motion to recuse Judge Porter K. Brown. The State contends that, because Judge Brown did not preside at the defendant's trial, this issue is moot.

K.S.A. 1985 Supp. 20-311d(c)(5) provides for the disqualification of a trial judge when a party has cause to believe that on account of the personal bias, prejudice, or interest of the judge, a party cannot obtain a fair and impartial trial. K.S.A. 1985 Supp. 20-311d does not prescribe a mandatory type of procedure for disqualifying a judge for bias or prejudice, but rather contemplates a hearing as to the legal sufficiency of the affidavit. The affidavit must contain facts and reasons which give fair support for the belief that on account of the bias or prejudice of the judge, the affiant cannot obtain a fair trial. *Hulme v. Woleslagel*, 208 Kan. 385, 392, 493 P.2d 541 (1972).

In his affidavit to the court, the defendant stated that his right to a fair and impartial trial was being impaired because of the personal bias and prejudice of Judge Brown. Indicative of this bias was Judge Brown's failure to grant a continuance of the trial scheduled for April 1. A continuance was needed because Ruebke's attorney was unable to view the physical evidence gathered by the State, to receive and review the reports of laboratory examinations, and to prepare for trial.

Later, Judge Brown did grant the defendant's motion for a continuance of the trial date. Not only did Judge Brown grant the motion for a continuance, but also, because of illness, he was unable to preside over the actual trial.

In *State ex rel. Miller v. Richardson*, 229 Kan. 234, 238, 623 P.2d 1317 (1981), the defendant contended that the trial judge should have recused himself. In the affidavit filed against the judge, the only basis alleged for the respondent's claim of bias and prejudice was a recitation of adverse rulings made during the prior proceedings in the case. This court stated, "Previous rulings of a trial judge, although numerous and erroneous, are not alone sufficient to show the required bias or prejudice to disqualify a judge under K.S.A. 1980 Supp. 20-311d. Such rulings

are subject to review and correction on appeal and will not justify disqualification."

In the present case, the only evidence the defendant offers to support his allegations of bias is the adverse rulings by Judge Brown. Considering that Judge Brown did not preside at trial, there was no error in denying the defendant's motion for recusal of Judge Brown.

## 6. Evidence of Former Crimes

The defendant contends that the court erred in allowing evidence of his prior crimes to be presented to the jury. The State contends that such evidence was admissible to establish Ruebke's identity and his motive for committing the crimes.

K.S.A. 60-455 provides that evidence that a person committed a crime or civil wrong is inadmissible to prove his or her disposition to commit crime, but that such evidence is admissible when relevant to prove some other material fact, including motive.

Prior to this case, Ruebke had pleaded guilty in Reno County District Court to two counts of misdemeanor theft and one count of felony theft. The State wanted to introduce evidence of those crimes and statements made by Judge Brown at Ruebke's sentencing that if Ruebke violated his probation, he would be sent to prison.

Ruebke claims that, because first-degree murder is not a specific intent crime, proof of motive is not relevant. The State argues that the crime requires specific intent— premeditation—and, therefore, motive is relevant. Motive and intent, however, are not the same thing. Motive is the moving power which impels one to action for a definite result. Intent is the purpose to use a particular means to effect such result. Motive is that which incites or stimulates a person to do an act. *People v. Weiss*, 252 App. Div. 463, 468, 300 N.Y.S. 249 (1937).

Evidence of prior crimes was admitted under similar circumstances in *State v. Myrick & Nelms*, 228 Kan. 406, 616 P.2d 1066 (1980). There, the defendants were charged with the premeditated murder of a highway patrol officer. Nelms argued that the court erred in admitting into evidence testimony concerning an outstanding Missouri felony warrant issued against him prior to the murder. Evidence was also admitted showing Myrick was wanted by law enforcement officials in connection with a felony

bench warrant and failure to appear on a felony theft charge in Oklahoma. The prosecution argued that the motive for the senseless slaying of the trooper was the defendants' fear they would be identified and returned to Oklahoma or Missouri. The probative value of that evidence outweighed its prejudice to the accused and was admitted.

Here, the State had only circumstantial evidence to establish its case. The State maintained that the motive for the senseless slayings was Ruebke's need for money. To fulfill that need, he committed a theft. During the commission of that theft, Ruebke was discovered by Tammey and the twins. In an effort to prevent his being identified and to prevent his probation from being revoked, Ruebke committed the murders.

Considering the needlessness of the murders, motive was relevant to establish why the defendant would have committed the crimes. There was no abuse of discretion in allowing the State to introduce evidence of the prior crimes.

### 7. Prosecutorial Misconduct

Ruebke contends that a new trial should be granted because of three incidents of prosecutorial misconduct. The first incident was a comment the prosecutor made during his opening statement. The prosecutor stated that he would introduce testimony from Leanne Esser that the defendant had told her that he was very upset with a high school shop teacher. Ruebke had asked her if she would come and see him in jail if he killed someone or did something bad like that. The State argues that the statement made three days before the murders was one of the acts and circumstances which was an incident to the litigated act and, therefore, a part of the res gestae. *State v. Peterson*, 236 Kan. 821, 696 P.2d 387 (1985).

Ruebke's attorney did not object to the remarks by the prosecution in its opening statement. Later in the trial, Ruebke's attorney filed a motion in limine to suppress Esser's testimony. The trial court did not allow the testimony to be admitted in evidence.

The "contemporaneous objection rule" does not apply to opening statements of counsel because it is impossible to foresee which comments counsel might fail to establish through the evidence at trial. Absent substantial prejudice to the rights of the defendant, there must be a showing of bad faith on the part of the

prosecutor before relief may be granted as a result of a prosecutor's reference in his opening statement to matters not provable or which the prosecutor does not attempt to prove at trial. *State v. Pink*, 236 Kan. 715, Syl. ¶ 4, 696 P.2d 358 (1985).

Here, the State was ready to provide support for the opening statements. The prosecutor proffered the testimony to show Ruebke's state of mind. The witness was present and ready to testify at trial. She had been subpoenaed to testify on two prior occasions. The defendant's attorney had the investigative report concerning her statements. The defense attorney knew that the witness was going to be called at trial, but did not seek to suppress her testimony until after the State's opening statement. There is no evidence to suggest that the prosecution was acting in bad faith when it made its opening statement.

The second incident of prosecutorial misconduct involved a supplemental report prepared by a Reno County Sheriff's Department officer which the prosecution failed to turn over to the defendant. The prosecution was not aware of the report until the night before the officer testified. The defendant was given a copy of the report for use in his cross-examination of the officer.

The State contends that the defendant was not entitled to the report until after the officer had testified on direct examination. It contends that no prejudice was shown by the defendant, who obtained a recess to study the report after it surfaced.

K.S.A. 22-3213(1) provides:

"In any criminal prosecution brought by the state of Kansas, no statement or report in the possession of the prosecution which was made by a state witness or prospective state witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination at the preliminary hearing or in the trial of the case."

Even though the prosecutor was under a discovery order, there is no evidence of bad faith on his part. K.S.A. 22-3212(7) provides that when a party fails to comply with such an order, "the court may order such party to permit the discovery or inspection of materials not previously disclosed, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may enter such other order as it deems just under the circumstances."

This court considered a similar situation in *State v. Jackson*, 226 Kan. 302, 597 P.2d 255 (1979), *cert. denied* 445 U.S. 952 (1980). There, the existence of the report came as a surprise to all

the parties. When the defendant's counsel complained about the prosecution's failure to comply with the discovery order, the trial court ordered the prosecution to provide a copy to the defendant. This court said that terminating a trial and declaring a mistrial was largely within the discretion of the trial court, and that there was not a clear showing of abuse of discretion. 226 Kan. at 306.

In the present case, the prosecution was not aware of the report until the day before it was introduced at trial. The defendant's attorney was provided a copy of the statement at trial and a recess was granted so that he could study the report prior to cross-examining the officer concerning the report. There was neither an abuse of discretion by the trial court in not terminating the trial nor such bad faith on the part of the prosecutor as to require a new trial.

Ruebke claims that the trial court should have granted a new trial because the prosecutor had failed to reveal exculpatory evidence to the defense. On June 5, 1985, defense counsel learned that a man named Lonnie Gaston claimed to know the real murderer and that the prosecution knew about this man in early May, yet failed to report this information to the defense.

Lanelle Hart was working at a Hutchinson radio station on May 2, 1985, when Lonnie Gaston approached her. He made statements that people were trying to kill him, he threatened Lanelle Hart, and he stated that he was going to kill his father. He told her that he and Ruebke had been tied up in the back of a car when the shootings occurred. They had heard the shots and saw the people leaving the scene. Lanelle contacted her attorney, who told her to inform the county attorney about this incident.

At the hearing on the motion for a new trial, the State called James Gilliland, a Hutchinson attorney who had represented Gaston at an involuntary commitment proceeding on May 14, 1985. He testified that Gaston had been involuntarily committed to Larned State Hospital. The State contended that any statements by Gaston were the statements of a mentally imbalanced person and its failure to notify the defendant of Gaston's statements was not a sufficient basis for granting a new trial.

Prosecutors are under a positive duty, independent of court order, to disclose exculpatory evidence to a defendant. To justify a reversal of a conviction for failure to disclose evidence, the

evidence withheld by the prosecution must be clearly and unquestionably exculpatory and the withholding of the evidence must be clearly prejudicial to the defendant. A new trial should be granted only if the record establishes: "(1) that evidence was withheld or suppressed by the prosecution, (2) that the evidence withheld was clearly exculpatory, and (3) that the exculpatory evidence withheld was so material that the withholding of the same from the jury was clearly prejudicial to the defendant." *State v. Kelly*, 216 Kan. 31, 36, 531 P.2d 60 (1975). Evidence is exculpatory if it tends to disprove a fact in issue which is material to guilt or punishment. *State v. Kelly*, 216 Kan. at 36.

There is no evidence to suggest that there was a bad faith withholding of the information concerning Gaston by the prosecution. Nor was there a deliberate refusal to honor a request for evidence. The statements by Lonnie Gaston were clearly not exculpatory. They were the statements of a man who was later declared an incompetent. Even the defendant's own testimony concerning his actions during the day of the shooting contradicted the statements of Gaston. There was no withholding of exculpatory evidence on the part of the prosecution requiring the granting of a new trial.

### 8. Mistrial

The defendant contends that the trial court erred in failing to grant a mistrial on the five occasions he requested a mistrial.

Declaration of a mistrial under the provisions of K.S.A. 22-3423 is a decision largely within the discretion of the trial court and that decision will not be set aside on appeal absent a clear showing of abuse of discretion. *State v. Bagby*, 231 Kan. 176, 179, 642 P.2d 993 (1982). An abuse of discretion exists only when no reasonable man would take the view adopted by the trial court. *Wilson v. American Fidelity Ins. Co.*, 229 Kan. 416, 422, 625 P.2d 1117 (1981).

Defense counsel first moved for mistrial after learning one afternoon that the defendant had spoken to one of the alternate jurors as she returned for jury duty. Ruebke commented to the juror that her car looked like his and she should be careful since he had been tailed by a number of police officers after he had posted bail. Two days later, the juror notified the judge of the conversation. The juror was called into chambers where the judge and attorneys for both parties questioned her. After deter-

mining that the conversation had not affected the impartiality of the juror, the judge denied defendant's motion for mistrial. (The alternate juror did not replace one of the 12 regular jurors.)

The second motion for mistrial was filed after the defendant learned that another of the jurors, who was later elected foreman of the jury, was a member of the board of directors of the Reno County chapter of Crimestoppers. The judge questioned the juror in chambers and determined that the juror had not received any information concerning the Ruebke case through Crimestoppers. The judge determined that the juror's relationship to Crimestoppers would not prevent him from acting in an impartial manner.

The third motion for mistrial was filed when the defendant learned that one of the jurors had talked with a Hutchinson police officer, Tom Angell, who was the brother of one of the State's witnesses, Ken Angell, a Reno County Sheriff's sergeant. Both the juror and the brothers were employed by Dillard's Department Store as security guards. Tom Angell did not discuss the trial with the juror. He also told her that she should have no contact with any of the security people during the trial. The juror did not have any contact with Ken Angell. After questioning the juror in chambers, the judge determined that no prejudice resulted from the juror's contact with Tom Angell.

The defendant filed his fourth motion for mistrial following certain publicity in The Hutchinson News. On Saturday, May 25, 1985, the newspaper ran a color, page-wide sketch of the jury on the front page plus a story about trial testimony and a sidebar concerning a confrontation between the defendant and Sheriff James Fountain. The newspaper also ran a front-page story on May 26, 1985, concerning the defendant's arrest for aggravated battery of a child on Saturday, May 25, 1985. The court stated that it had admonished the jury not to read or listen to media accounts of the trial and believed the jurors had taken the admonishment seriously. It did not grant a mistrial.

In his fifth motion for mistrial, the defendant alleged that one juror had heard some of the media publicity concerning the defendant's arrest on the aggravated battery charge. The juror had heard a television announcement to the effect that the defendant had been arrested for assaulting a 12-year-old boy, and at that point the juror had left the room. The court and attorneys

for both parties questioned the juror in chambers. The juror indicated that what he had heard would not affect his decision in the present case. The judge found that there was no prejudice to the defendant and denied the motion for mistrial.

Even though media publicity may be inflammatory and prejudicial in character, the burden is upon the defendant to show an abuse of discretion by the trial court in denying his motion for mistrial. To establish an abuse of discretion, the defendant must show prejudice resulting to him from the publication of the information. *State v. Malone,* 194 Kan. 563, 573, 400 P.2d 712 (1965).

Generally, jury misconduct will not constitute a ground for reversal unless it is shown to have substantially prejudiced the rights of a party. *Cleveland v. Wong,* 237 Kan. 410, 425, 701 P.2d 1301 (1985). Here, there is no evidence to suggest that the jury was aware of all the trial publicity. To the contrary, the testimony suggested that the jury was doing everything possible to avoid hearing or reading any media reports. The fact that one juror accidentally heard a report about the defendant does not establish that the defendant was prejudiced by the publicity. The trial court did not abuse its discretion in denying any of the five motions for mistrial.

The defendant contends that the trial court erred in failing to grant a new trial after it was learned that one of the jurors was related to the victim, Tammey Mooney.

Under K.S.A. 22-3410(2)(a), a juror may be challenged for cause if he or she is related to the victim by consanguinity within the sixth degree or is the spouse of any person so related.

The juror was unaware at the time of trial of the relationship, if any, she had to the victim. At the hearing on the motion for a new trial, it was established that the juror's husband's sister was married to the uncle of Tammey Mooney's father. There was no blood relationship between the juror and Mooney's family. Under the statute, the juror could not have been removed for cause since she was not the spouse of anyone related to the victim within the sixth degree of consanguinity.

In *State v. Collins,* 215 Kan. 789, 528 P.2d 1221 (1974), a juror had denied during voir dire having any relatives in law enforcement, even though her son-in-law was employed by the Sedgwick County Sheriff's office. This court said:

"Under K.S.A. 1973 Supp. 22-3423 the trial court 'may' order a mistrial if false statements of a juror on voir dire prevent a fair trial. The determination is left to the discretion of the trial court and failure to grant a mistrial due to misstatements of a juror on voir dire will not 'constitute reversible error unless an abuse of discretion is shown." 215 Kan. at 790-91.

The juror testified that until she heard it on the news after the trial she did not know she was related to Tammey Mooney. She did not know Tammey Mooney and had never met Tammey or anyone in Tammey's immediate family. Ruebke failed to establish any prejudice resulting from the relationship between the juror and the victim. There was no abuse of discretion on the part of the court in denying a new trial.

## 9. Evidence of Shotgun Shells

The defendant contends that the court erred in receiving State's Exhibit No. 49. The exhibit consisted of eight No. 6 load shells which Ruebke had returned with the shotgun to its owner. The K.B.I. expert testified that when he received Exhibit No. 49 at the laboratory, it consisted of a plastic sack with nine No. 6 shotgun shells and one duck and pheasant load shell. At the time of trial, the exhibit contained only eight shotgun shells. He explained that one of the shotgun shells had been cut up for display, but could not explain the disappearance of the duck and pheasant load shell.

Establishing the chain of custody is part of the foundation for the admission of physical evidence. Generally, the admissibility of physical evidence is within the sound discretion of the trial court and is to be determined by the court on the basis of its relevance and connection with the accused and the crime charged. Deficiencies in the chain of custody ordinarily affect the weight of the evidence, not its admissibility. *State v. Taylor,* 231 Kan. 171, 174, 642 P.2d 989 (1982).

The deficiency in the chain of custody of the shotgun shells does not go the admission of such evidence. It merely goes to the weight of such evidence. The trial court did not err in receiving into evidence the shells and the testimony concerning the shells.

## 10. Testimony of the Pennels

The defendant contends that the trial court erred in refusing to allow the testimony of Mr. and Mrs. Pennel. Had the Pennels been allowed to testify, they would have said that Bill Lorg, Tammey Mooney's boyfriend, had described to them in detail on

the evening of December 31, 1984, where the twins were found, how they were killed, and where they were shot. The court ruled that this testimony was irrelevant.

Relevant evidence is evidence having any tendency in reason to prove any material fact and the determination of relevancy is a matter of logic and experience. Subject to certain exclusionary rules, the admission of evidence lies within the sound discretion of the trial court. *State v. Chatmon*, 234 Kan. 197, 203, 671 P.2d 531 (1983).

The statements made by Lorg were made nearly two months after the incidents occurred. All of the information which Lorg discussed had been presented at the preliminary hearing and had been broadcast or printed by the news media. All this evidence tended to prove is that Lorg was discussing certain facts surrounding the crime which were available to the general public. Other than the fact that Lorg knew Tammey Mooney, the Pennels' testimony does not show that Lorg had any special knowledge or that he was in any way connected with the crime. The evidence was not relevant to the trial of the defendant.

The trial court did not abuse its discretion in refusing to allow the admission of the testimony of the Pennels.

### 11. Giving a Supplemental Instruction

The defendant contends that the trial court erred in failing to allow the jury to have testimony it requested be read to it and in giving supplemental instruction No. 1 in response to that request.

While deliberating, the jury asked eight questions about testimony given during the trial. Rather than reading back the testimony to the jury, the court replied with supplemental instruction No. 1:

"Ladies and Gentlemen of the Jury:
"The majority of the questions you have asked are general in nature relating to a great deal of information that was elicited in this case. I cannot answer the questions relating to the facts given to you. The jury is to act as a fact finder and the 12 of you need to communicate with each other to resolve the questions you have propounded to the Court.
"If you have a specific question with relation to the testimony of one witness' testimony we can have that specific portion of testimony re-read to you. If the court were to attempt to re-read the record to attempt to answer the questions you have asked, I fear that we would re-read most of the testimony in this trial."

The defendant did not object to the giving of the supplemental

instruction at the time of trial. No party may assign as error the giving or failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection. K.S.A. 22-3414(3).

A trial court is authorized to give supplemental instructions to a jury upon the jury's request pursuant to K.S.A. 1985 Supp. 60-248(e). It is a matter of discretion with the trial court whether to give additional instructions. *State v. Lovely,* 237 Kan. 838, 845, 703 P.2d 828 (1985). It is also a matter of discretion whether the trial court will allow the reading of testimony to the jury if it requests such after retiring to deliberate the case. *Phillips v. Carlson,* 178 Kan. 206, 284 P.2d 604 (1955).

After the jury received supplemental instruction No. 1, it did request more specific testimony. The court then had the testimony the jury requested read back to it.

The trial had lasted for nearly 3 ½ weeks. There was voluminous testimony. The judge did allow the jury's requests for specific testimony to be read. There was no abuse of discretion on the part of the court by refusing to have large portions of the transcript read back to the jury.

## 12. Newly Discovered Evidence

The defendant contends that the trial court erred in failing to grant a new trial for newly discovered evidence. Approximately a week after the trial, Becky Oller informed the defense counsel that Marty Hemphill had told her and Ronald Tarrant that in December of 1984 while in the Hitching Post Tavern in Turon, Kansas, Bill Lorg told Marty Hemphill that he had killed the Vogelsang twins and Tammey Mooney.

A new trial may be granted under K.S.A. 60-259 for newly discovered evidence when it appears the rights of a party are substantially affected. The evidence must be of such materiality that it would be likely to produce a different result upon retrial. The credibility of the evidence offered is for the trial court's consideration. *State v. Shepherd,* 232 Kan. 614, Syl. ¶ 10, 657 P.2d 1112 (1983). In order for evidence to be newly discovered evidence, it must be material to the cause of the movant and contain information which the movant with reasonable diligence could not have discovered and produced at trial. *State v. Ferguson, Washington & Tucker,* 228 Kan. 522, 530, 618 P.2d 1186 (1980).

At the hearing on the motion for a new trial, Becky Oller's testimony was presented in the form of a proffer of testimony. Ronald Tarrant and Marty Hemphill testified that Bill Lorg made no such statements to them and Hemphill denied making the statement to Becky Oller.

First, there is a question as to whether the defendant could have discovered this information before trial. He was aware of at least one conversation Lorg had with the Pennels the same evening that Lorg allegedly made the statements to Hemphill. With diligent investigation, it may have been possible for the defendant to discover the alleged statements. The evidence was not of such materiality that it would be likely to produce a different result upon retrial. Lorg and Hemphill denied that the statements were ever made. It is only the hearsay testimony of a third party that the statements were made. Under the circumstances, there was no abuse of discretion by the trial court's denial of the motion for new trial for newly discovered evidence.

## 13. Questioning of the Jury

The defendant contends that he needed to question the jury panel as to (1) whether the prosecutor's opening remarks referring to the testimony of Leanne Esser were discussed; (2) whether the incident involving the alternate juror Davidson was discussed; (3) whether the evidence of the defendant's former convictions was discussed; (4) whether juror Wortman's membership in Crimestoppers was discussed; (5) whether the jury had heard or read any of the publicity surrounding the trial; and (5) whether certain jurors had discussed the case outside the courtroom while the trial was progressing. The court refused to allow the jurors to be called to testify about the allegations.

K.S.A. 60-441 provides:

"Upon an inquiry as to the validity of a verdict or an indictment no evidence shall be received to show the effect of any statement, conduct, event or condition upon the mind of a juror as influencing him or her to assent to or dissent from the verdict or indictment or concerning the mental processes by which it was determined."

K.S.A. 60-444(a) provides:

"This article shall not be construed to (a) exempt a juror from testifying as a witness to conditions or occurrences either within or outside of the jury room having a material bearing on the validity of the verdict or the indictment, except as expressly limited by K.S.A. 60-441."

Supreme Court Rule 181 (235 Kan. cxviii) states:

"POST-TRIAL CALLING OF JURORS. Jurors shall not be called for hearings on post-trial motions without an order of the court after motion and hearing held to determine whether all or any of the jurors should be called. If jurors are called, informal means other than subpoena should be utilized if possible."

Jurors may be recalled for post-trial hearings only by order of the court after a hearing on a request to recall the jury. A recall of the jury is not a routine matter. Jury service is a public duty of citizens and recall of jurors after their service has ended to testify as to events occurring in the jury room during deliberations is a serious step. That step is to be undertaken only for just cause. The procedure should never be utilized as a fishing trip upon a losing party's hope that jury misconduct might surface if the jurors could be questioned under oath. The burden is upon the party seeking an order to recall the jurors to show the necessity for the order. *Walters v. Hitchcock,* 237 Kan. 31, 36, 697 P.2d 847 (1985).

K.S.A. 60-259(c) requires that a motion for new trial specifically state the alleged errors or grounds relied upon to support a new trial. Mere use of statutory language is insufficient. Evidence must be produced whenever the motion is grounded upon "exclusion of evidence, want of fair opportunity to produce evidence, or newly discovered evidence." K.S.A. 60-259(g). Where counsel makes no showing to support allegations of juror misconduct, the trial court does not abuse its discretion in refusing to call jurors. *Cornejo v. Probst,* 6 Kan. App. 2d 529, 537, 630 P.2d 1202, *rev. denied* 230 Kan. 817 (1981).

The trial court did allow three jurors to be called to testify at Ruebke's hearing for a new trial. During Ruebke's trial, the judge had already considered many of the matters defense counsel wished to discuss with the jurors. The judge had questioned (1) juror Wortman concerning his membership on the board of directors of Crimestoppers; (2) juror Davidson concerning the contact she had had with the defendant in the hall; (3) juror Mullins concerning news he had heard of the trial; and (4) juror Penner concerning her contact with one of the witness' brothers.

The defendant had no valid evidence on which to base his motion for new trial. The judge had conscientiously allowed jurors to be interviewed during and after the trial. He did not

allow a mass interview of the jury panel in hopes of turning up some form of juror misconduct. There was no abuse of discretion on the part of the judge by refusing to allow the defendant to interview the whole jury panel.

### 14. Removal of Hair from the Defendant

The defendant argues that the court erred in allowing the State to remove hair from his head.

When the State sought to obtain hair samples from the defendant, defense counsel refused to allow the State to take the samples. The State then obtained a search warrant to get a sample of head hair. Prior to issuance of the search warrant, the court heard defendant's request for a protective order to prevent the State from taking the head hair.

Where the State has obtained an order of the court directing that hair samples be cut from defendant's head, there is no violation of Fourth Amendment rights against unreasonable search and seizure. *State v. Weigel,* 228 Kan. 194, 198, 612 P.2d 636 (1980).

The defendant argues that the only time hair samples can be taken is when they are taken incidental to a lawful arrest. This, however, has never been the law. The courts have allowed, at various times, physical samples to be taken and used as evidence. The courts have held that the constitutional guarantee against compulsory self-incrimination is not violated by compelling an accused to exhibit his body at trial for purposes of identification. 21A Am. Jur. 2d, Criminal Law § 712. An accused may be required to give an exemplar of his handwriting without violating his privilege against self-incrimination. *United States v. Euge,* 444 U.S. 707, 63 L. Ed. 2d 141, 100 S. Ct. 874 (1980). The United States Supreme Court has also held that the withdrawal of blood from an accused by a physician despite the accused's refusal to consent does not violate the privilege against self-incrimination. *Schmerber v. California,* 384 U.S. 757, 16 L. Ed. 2d 908, 86 S. Ct. 1826 (1966).

Ruebke does not attack the validity of the search warrant. He offers no argument as to why the search warrant should not have been issued nor why the hair samples should not have been taken. There was no abuse of discretion in allowing the State to take hair samples from the defendant.

### 15. Greg Fountain's Testimony

The defendant argues that the trial court erred in allowing the testimony of Greg Fountain because it was irrelevant and remote.

K.S.A. 60-401(b) states that relevant evidence means evidence having any tendency in reason to prove any material fact. Whether evidence is too remote to be admissible rests within the sound discretion of the trial court. Lapse of time may not be sufficient to deprive evidence of its value, but goes to the weight of the evidence, which is for the jury to determine. *State v. Green*, 232 Kan. 116, Syl. ¶ 5, 652 P.2d 697 (1982).

Fountain testified to a conversation he had had with the defendant 5 ½ months prior to the murders. He and Ruebke discussed the use of shotguns to avoid ballistics matching the shot to any particular shotgun. In addition, it was indicated the shotgun shell casings should be picked up and thrown into a river. They discussed that it was common for homicide victims to be left in isolated tree rows, and that if a body was left on top of the ground the remains would be scattered or devoured by scavengers.

In *Green,* the court held that the fact that a battery conviction occurred a year prior to the murder for which the defendant was charged did not make the conviction so remote as to be improperly admitted. In *State v. Fenton,* 228 Kan. 658, 620 P.2d 813 (1980), the defendant had threatened to kill his wife ten months prior to her death. The court did not find that ten months made the evidence too remote to be admissible. In *State v. Anicker,* 217 Kan. 314, 536 P.2d 1355 (1975), testimony that the defendant had assaulted and beaten his deceased wife seven months prior to the homicide was held relevant and admissible on the issues of identity, intent, and motivation.

The State contends that the testimony of Fountain went to establish premeditation. The murderer used a shotgun and disposed of the bodies in much the same way as Fountain and Ruebke had discussed earlier. The trial court did not abuse its discretion in allowing Fountain's testimony.

### 16. Admission of the Videotape

Ruebke argues that the trial court erred in allowing the jury to view a gruesome videotape in addition to gruesome photographs

showing the bodies of the victims and the location where the bodies were found.

Admission of demonstrative photographs lies within the broad discretion of the trial judge. In determining whether demonstrative photographs should be admitted, a trial judge must determine whether they are relevant and whether a proper foundation has been laid. *State v. Kendig,* 233 Kan. 890, 892, 666 P.2d 684 (1983).

The defendant contends that the videotape was repetitious and gruesome. The State contends that the videotape of the bodies of victims as they lay in the position in which they were found helped demonstrate and amplify the testimony of the KBI criminalists. Since the defendant argued that the bodies could have been carried into the woods after being shot, in order to prove aggravated kidnapping, the State needed to establish that the victims had been shot in the woods.

Photographs are erroneously admitted where they are unduly repetitious, gruesome, and without probative value. *State v. Dargatz,* 228 Kan. 322, 614 P.2d 430 (1980). They are not inadmissible as evidence merely because they may be gruesome and shocking, provided they are true reproductions of relevant physical facts and conditions material to matters in issue. *State v. McCorgary,* 224 Kan. 677, 681, 585 P.2d 1024 (1978).

We have viewed the photographs and the videotape depicting the bodies and the area where they were found. The photographs and the videotape are gruesome. They show the grotesquely mutilated bodies of the three young victims. They depict the crime scene and the nature, extent, and the number of shotgun wounds inflicted on each of the three victims. They show that Ruebke was correct when he told others, prior to the information being released by the authorities, that death had been inflicted by a shotgun and the number of wounds to each victim. They indicate that the victims walked to the place of their execution—an isolated woody area. The bodies lay on top of the ground where death had been inflicted, and were exposed to the elements and animals. The spent shotgun shells had been removed from the death scene.

It is recognized that the admission in evidence of photographs of homicide victims must necessarily rest largely in the discretion of the trial judge. In each case, it is the trial judge who determines whether the photographs serve a proper purpose in

the jury's enlightenment. His action will not be disturbed by an appellate court unless there was an abuse of discretion.

Here, the photographs and the videotape had a reasonable tendency to prove or disprove a material fact in issue, or shed light upon a material fact. Photographs of the homicide victims are admissible in evidence even though they portray a gruesome scene and may tend to arouse the passion and resentment of the jury against the defendant. What Ruebke is claiming is that an individual may commit a murder so gruesome that photographs of victims and the murder scene must be kept from the jury to insure that the defendant receives a fair trial. We do not agree or adopt his reasoning.

### 17. Testimony of Kevin Sipe

The defendant argues that the trial court erred in allowing the preliminary hearing transcript of Kevin Sipe's testimony to be read at trial.

K.S.A. 1985 Supp. 60-460(c)(2) provides that if the judge finds that the declarant is unavailable as a witness at a hearing, testimony given as a witness in another action or in a preliminary hearing or former trial in the same action may be used, except such testimony may not be used in criminal actions if it denies to the accused the right to meet the witness face to face. K.S.A. 60-459(g)(3) defines "unavailable as a witness" to include a witness who is unable to be present or to testify at the hearing because of death or then-existing physical or mental illness.

Sipe testified at the preliminary examination that he had observed the defendant with Tammey Mooney and the Vogel-sang twins. After he had testified at the preliminary examination, Kevin Sipe was seriously burned in an accident. The court found that Sipe was unavailable to testify and the transcript of his prior testimony should be admitted as evidence in the trial.

In cases of necessity, it is generally held that the right of confrontation under the Sixth Amendment and Section 10 of the Kansas Bill of Rights is satisfied if the accused has been once confronted by the witness against him in any stage of the proceedings on the same accusation and has had an opportunity of cross-examination. *State v. Mick*, 229 Kan. 157, 161, 621 P.2d 1006 (1981).

In *State v. Mick*, 229 Kan. 157, the defendant alleged error when the transcript of the preliminary hearing testimony of one

witness was used. The court determined the witness was unavailable to testify. This court said:

"The testimony was given at the preliminary hearing and the defendant at that time was represented by an attorney who availed himself of the opportunity to cross-examine the witness. Under these circumstances the provisions of the above statutes were complied with. The right of the accused to be confronted by his accusers was honored. The witness' prior testimony bore sufficient indicia of reliability and afforded the trier of fact a satisfactory basis for evaluating the truth of the prior statement." 229 Kan. at 161.

See also *State v. Lashley,* 233 Kan. 620, 627-28, 664 P.2d 1358 (1983), in which the court held that there was no error in allowing the admission of preliminary examination testimony where a witness was unavailable.

Ruebke contends that the court incorrectly found the witness unavailable. The sufficiency of proof of unavailability is a question for the trial court within its discretion and its ruling will not be disturbed unless an abuse of discretion is shown. *State v. Steward,* 219 Kan. 256, Syl. ¶ 6, 547 P.2d 773 (1976).

The State provided the court with a letter from the witness' doctor stating that the victim was suffering from second- and third-degree burns and that it would not be in his best physical and mental well-being to appear in court and testify. The prosecution did not solicit the letter, but the witness' mother did. She testified at the hearing on the motion for new trial that Sipe was being sedated every day because of the pain and he was not totally alert until late afternoon. Under the circumstances, there was no abuse of discretion on the part of the court in finding this witness unavailable and allowing the transcript of his prior testimony to be read to the jury.

### 18. Cumulative Error

The defendant argues that his due process rights were violated by the cumulative errors in the course of the trial.

K.S.A. 60-261 provides:

"No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."

Ruebke fails to establish that his substantial rights were vio-

lated. We have examined each of his claimed errors and balanced them against his rights. There were some errors committed, but the errors did not deprive Ruebke of his due process rights.

### 19. Habitual Criminal Act

The defendant argues that the trial court abused its discretion in sentencing him under the provisions of the Habitual Criminal Act, K.S.A. 1985 Supp. 21-4504. He argues that the judge was under the impression that once the State offered evidence of a prior felony conviction, it was mandatory for him to enhance sentence. He admits at the rehearing on the matter that the judge corrected the error and refused to change the sentence.

The judge stated at the sentencing hearing:

"I think the attorneys know that once that filing is made by the County Attorney's Act [sic], the court has no choice but to invoke the act."

At a second hearing on the sentencing, the judge stated:

"I think we miscommunicated because I think I do have discretion as to whether or not to invoke the Habitual Criminal Act. I don't think I have any discretion with respect to whether or not I look at it after the appropriate filing has been made by the County Attorney.

"I think the remainder of the sentencing, there is no change in the sentence. I only do this to hopefully clarify what was said at the sentencing that day since this was the first time that I had a chance to, or ever had to look at this type of sentence."

The judge refused to modify Ruebke's sentence at the second hearing.

In *State v. Robinson,* 233 Kan. 384, 662 P.2d 1275 (1983), this court reaffirmed the constitutionality of the Habitual Criminal Act. The court noted that under the Act it was a matter of discretion whether the prosecutor moved the trial court to invoke the provisions of the Act. There are no cases which say that once the prosecutor seeks to have the Act invoked that the court must enhance sentence. This court has treated all such cases questioning enhancement of sentence as being a matter of discretion with the trial court. *State v. Cunningham,* 236 Kan. 842, 695 P.2d 1280 (1985); *State v. Irving,* 231 Kan. 258, 644 P.2d 389 (1982).

In the present case, the court stated at the second hearing that it was aware it was a matter of discretion as to whether it decided to invoke the Act. The prosecution had sufficiently established that the defendant had been convicted of a prior felony. It was then a matter of discretion whether the trial court applied the Habitual Criminal Act.

We have examined each of the defendant's claims that he was denied a fair trial. We find them to be without merit. The judgment is affirmed.

ALLEGRUCCI, J., not participating.